Turner, J.
 

 A majority of the Court of Appeals ordered a journal entry in this case in which it is stated that such majority “find that in the record and proceedings thereof there is error manifest on the face-of said record to the prejudice of the defendant-appellant in this, to wit:
 

 
 *221
 
 “That the Court of Common Pleas of Mahoning county, Ohio, committed prejudicial error in overruling defendant-appellant’s motion for judgment in its favor at the conclusion of plaintiff-appellee’s evidence; in overruling the motion of the defendant-appellant for judgment in its favor at the conclusion of all the evidence; in overruling the motion of the defendant-appellant for judgment notwithstanding the verdict of the jury, which the court finds was timely interposed; the court further finds that there was no evidence in the record that the defendant-appellant was guilty of any negligence directly and proximately producing the death of plaintiff-appellee’s decedent * *
 

 For convenience, we shall refer to the parties as plaintiff and defendant.
 

 We may dispose of the first ground of error set out in the journal entry with the observation that inasmuch as the defendant in the trial court introduced evidence in defense it waived any error which there might have been in the trial court’s ruling at the conclusion of plaintiff’s evidence.
 
 Halkias
 
 v.
 
 Wilkoff Co.,
 
 141 Ohio St., 139, 47 N. E. (2d), 199. This principle was recognized by the Court of Appeals in the majority opinion, but nevertheless such ground of prejudicial error appears as sustained in the journal entry. As the sufficiency of the statements in the pleadings is not questioned, the other grounds of error may be summarized in the last stated ground, to wit: “The court further finds that there was no evidence in the record that the defendant-appellant was guilty of any negligence directly and proximately producing the death of plaintiff-appellee’s decedent.”
 

 The evidence discloses that two high school boys of the approximate age of seventeen years were walking in a northerly direction along the berm of a country road with an eighteen-foot-wide hard surface. The
 
 *222
 
 time' was eleven o’clock in the morning, on May 29, 1942. The day was “a nice, clear, sunshiny day.” Except for these two boys and the truck hereinafter referred to, there was no traffic on this road. Traveling-in the same (northerly) direction on this road was the two-ton dump truck with dual rear wheels. The overall length of the truck was seventeen feet, six inches. The dump body was eight feet long- and seven feet wide, extending out beyond the rest of the truck. The bottom of the truck bed was forty-three inches above the ground. There was no fender over the right rear wheel. The .exhibits show no' running board back of the cab part of the truck. The driver sat on the left hand side of an enclosed cab. The front of the truck, so far as could be observed by the truck driver, passed decedent but he was run over by the right rear wheel which left marks on the paved section of the road.
 

 A witness testified.
 

 ££Q. What do you say to the people of the jury as to whether that dump body extended out beyond the rest of the truck or not? A. Well, I would say that it extended out.”
 

 The truck was loaded with seven and a half tons of gravel and was travelling- at about eight miles per hour in extra low gear up a grade.
 

 The driver of the truck testified :
 

 <£Q. Now, as you proceeded up this grade, in the direction of the Mayberry home, where were these boys with reference to the hard surface roadway? A. Right at the edge of the road.
 

 ££Q. Right at the edge of the road? A. They was off of the pavement. .
 

 £‘Q. All right, and walking along right off of the edge of the hard surface? A. That is right.
 

 ££Q. All right, are you able to tell us how they were walking, that is whether they were walking side by
 
 *223
 
 side, or apart, or how they were walking? A. Well, Mayberry was ahead of the Wilkeson boy. * * *
 

 “Q. All right, and, as you approached them, I want you to tell the people on the jury whether you sounded any horn as you aproached near to where they were walking: A. No.
 

 “Q. Did you turn the course of your truck, in any way, so as to get farther over toward the middle of the road? A. No.
 

 “Q. What do you say, Mr. G-uerrier, as to whether your truck proceeded in a straight course as you came nearer to where these boys were walking and proceeded on and passed them? A. That is right.
 

 “Q. Did you take a straight course? A. That is right. # * *
 

 . “Q. Just before you passed them by, I will ask you, if you noticed in which direction these boys were looking? A. Well, when I passed them or how do you mean?
 

 ‘ ‘ Q. Just as you were up there ready to pass them? A. Well, they were both looking ahead.
 

 “Q. In other words, looking in the direction in which you were going, Mr. Guerrier, I will ask you whether that is right, there was anything, any obstruction on the road that prevented your truck from operating over more to the west, or toward the center of the road. A. No.
 

 “Q. How far would you say the Mayberry boy was ahead of the Wilkeson boy? A. Well, about two or three feet. * * *
 

 “Q. Now, as you came up the grade nearer to where these boys were walking along, did you notice either one of these boys doing anything in particular? A. Yes, the Wilkeson boy was kicking the grass. * # *
 

 “Q. When you saw this Wilkeson boy doing this, did you give any warning of any kind of the approach of your truck? A. No.
 

 
 *224
 
 “Q. How far back were you from these boys when you noticed this boy kind of going along kicking the grass, as you said, and that sort of thing? About how far back would you say you were from them when you noticed that? A. About seventy-five feet, or something like that. * * *
 

 ;‘Q. Where did you say the Wilkeson boy was walking from the"hard surface of the road? A. Right at the edge of it.
 

 “Q. All right. When you zzoticed the Wilkeson boy walking along the edge of the hard surface of the road, and you saw him, as you say,, kind of kicking away at the grass, or something of that sort, did you continue to watch him do that as your truck got up to where they were? A. No.
 

 “Q. Didn’t you watch him any more? A. No, he was ozz the side of the road.
 

 “Q. You didn’t pay any more attention to him? A. Well, I could see him, sure, I could see him ahead.
 

 “Q. Did you pay any particular attention to the boy? A. Well, a little. * ’* *
 

 “Q. Mr. Guerrier, did your truck run over the Wilkeson boy? A. Yes, sir.
 

 “Q. What brought that to your attention? A. Well, I was the only truck there and I felt the bump. I felt the truck go over.
 

 “Q. Where did the bump seem to come from that you felt? A. The back wheel.
 

 “Q. On which side? A. The right.”
 

 The evidence disclosed that the Wilkeson boy was not struck by the front part of the truck but that the rear right wheel ran over and crushed his head. The boy was found lying on the east side of the paved road with the head to the north and the feet to the south approximately a foot to eighteen inches from the berm of the road. For eight or ten feet along the paved road
 
 *225
 
 parallel with the edge of the road and approximately “a foot or 18 inches” in from the edge of the hard surface of the road, the right rear wheel had left marks. An examination of the right rear wheel immediately after the accident disclosed the presence of blood thereon.
 

 The Mayberry boy testified:
 

 “Q. If you know, I would like to ask you whether or not you knew of the approach of the truck? A. No, sir, I didn’t.
 

 £ ‘ Q. And, I believe, you testified you heard no sound of a warning? A. That is right.”
 

 Earlier the Mayberry boy had testified:
 

 ££Q. If you know, just tell all you know about what happened on May 29th? A. Well, as we were walking right there next to our property, the truck pulled up ahead of me‘and stopped, and the driver jumped and told me this Lynn had been killed, and I looked back and he was lying on the road.
 

 ££Q. Can you describe to the jury in what position the Wilkeson boy was lying? A. Well, I would say he. was lying parallel with the road.
 

 “Q. And can you place his feet and the direction they were on the road? A. Well, his feet was pointing down south and his head north.
 

 ££Q. That would be toward the direction you were coming from? A. Yes, sir. * * *
 

 ££Q. And can you tell the court and jury where his body was with reference to the road, on the improved part or on the berm? A. It was on the improved part.”
 

 On cross-examination the driver of the truck testified :
 

 ££Q. Now, was the Wilkeson boy directly behind the Mayberry boy as they were walking up along side of the road there, on that occasion? A. That is right.
 

 ££Q. In other words, if I am the Mayberry boy and
 
 *226
 
 tlie Wilkeson boy was three or four feet behind, he would be directly behind me, would he? A. Yes, sir.
 

 “Q. And were they in that position, and walking in that manner, at the time the front of your truck passed by them and they passed out of your view? A. Yes, sir.
 

 “Q. Now, as you sat there on the left hand side of that truck, you couldn’t see off to your right? In other words, your view would be limited as you went past, they passed out of your view when, when you looked past the edge of the cab ? A. The first fender there. * * *
 

 ‘ ‘ Q. When the front of your truck passed these boys, were they still over on the grass strip? A. That is right.
 

 “Q. And were they-still over there when the cab passed these boys? In other words, the left side of the cab, in other words, the left side of the cab or right side of the cab, were they still over there then? A. I couldn’t say.
 

 “Q. You couldn’t see them then? A. No.”
 

 The driver of the truck also testified as follows:
 

 “Q. What.do you say, Mr. Gfuerrier, as tó whether the outside wheels on the rear extend out beyond the line of the front wheels? I mean your duals on the back, do they extend out beyond the front tires ?
 

 “Mr. Nicholson: That is, if you know. I don’t want any guesswork about it.
 

 “A. Well, I think it is a little bit, I ain’t sure. I don’t know how far out, but it is a little bit further than the fender, the front fender. * * #
 

 “The court: You mean the track of the front wheel would be between the, tracks of the two rear wheels? A. Yes, sir.”
 

 In the second amended petition upon which this case went to trial it was alleged:
 

 “Plaintiff further for its cause of action says that the said Gfuerrier, the operator of the truck in question, at the time and place of the collision was neg
 
 *227
 
 ligent in failing to keep a lookout on and about the road ahead of his truck; that the said driver, Guerrier, was negligent in that he failed to warn this plaintiff’s decedent of the approach of his motor truck, that the said driver, Guerrier, in attempting to pass by plaintiff’s decedent failed to allow sufficient clearance between his said motor truck and plaintiff’s decedent; that he failed to have his said motor truck under control; that he was negligent in failing to stop or divert the course of his truck so as to avoid striking plaintiff’s decedent.”
 

 It is the settled law of this state that a motion for a directed verdict involves an admission of all the facts which the evidence tends to prove. The weight of the evidence is not involved. The inquiry is to be limited to the question of whether there is
 
 any
 
 substantial evidence in this case to support the claims of plaintiff’s petition as to defendant’s negligence and that such negligence was the proximate cause of the alleged injury and resulting damage. As stated in 39 Ohio Jurisprudence, 799, Section 182:
 

 “A motion by one party to an action to direct a verdict in his favor on the evidence introduced or to take the ease from the jury because of the insufficiency of the evidence to establish a cause of action, since it is in the nature of a demurrer to the evidence, involves, for its purposes, an admission or assumption of the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, as well as an admission of all the facts which the evidence proves or tends to prove or support and of all reasonable inferences which a jury might draw therefrom. Such a motion necessarily assumes the fact that upon the case as presented there can be no recovery; it concedes to the plaintiff everything that the jury could possibly find in his favor, and presents only
 
 *228
 
 a question of law as to whether each fact indispensable to the right of action and put in issue by the pleadings has been supported by sufficient evidence; if it has, the motion must be denied and the case submitted to the jury under proper instructions, since no finding of facts by the court or weighing of the evidence is permitted. ’ ’
 

 It is also stated in Section 183, ibid:
 

 ‘ ‘ The trial judge, in ruling upon a motion, to direct a verdict or for a nonsuit on the evidence introduced, must not only assume the truth of the evidence in behalf of the party against whom the motion is directed, but must construe the evidence most strongly in favor of that party, or, as it is sometimes expressed, must give the most favorable interpretation or intendment in his behalf, and adopt the view most favorable to his contention, or consider it in the light most favorable to him, of which such evidence is susceptible. To this end the trial judge should give the party, against whom the motion is made, the benefit of all reasonable inferences that can be drawn from the evidence offered and consider as proved such reasonable inferences favorable to him as the facts proved warrant — as are deducible from the evidence given— without carrying the inferences to an illogical conclusion. In other words, the evidence must be construed favorably to the submission of the case to the jury, and the trial judge should indulge in every possible consideration in favor of such submission.
 

 “Formerly, if there could be said to be a scintilla of evidence in favor of such party on all material issues, the court had to submit the case to the jury. Under the present rule, however, if, after giving the evidence such favorable construction, reasonable minds can reasonably come to but one conclusion and that conclusion is adverse to the party against whom the
 
 *229
 
 motion is made, the judge should direct a verdict against him.”
 

 The fact that there was a difference of opinion among the members of the Court of Appeals, all of whom are experienced jurists, suggests at least that reasonable minds can reasonably come to more than one conclusion in respect of the evidence in this case.
 

 We are of the opinion that the record contains substantial evidence which, if construed favorably to plaintiff, will support a conclusion that there was negligence on the part of the servant which negligence was the proximate cause of the death of the Wilkeson boy.
 

 In the ease of
 
 Hamden Lodge
 
 v.
 
 Ohio Fuel Gas
 
 Co., 127 Ohio St., 469, 189 N. E., 246, the court held :
 

 “Upon motion to direct a verdict the party against whom the motion is made is entitled to have the evidence construed most strongly in his favor. * * #
 

 “Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury. The test is not whether the trial judge would set aside a verdict on the weight of the evidence.”
 

 We are of the opinion that under the pleadings and evidence it 'was for the jury to determine whether the servant for whom defendant was responsible exercised due care under the circumstances, that is, whether due care required the giving of a warning or the maintenance of a better lookout by the driver, or the changing of the course of the truck.
 

 Section 11601, General Code, provides:
 

 “When, upon the statements in the pleadings or upon the evidence received upon the trial, one party is entitled by law to judgment in his favor, judgment shall be so rendered by the court, although a verdict has been found against such party and whether or not
 
 *230
 
 motion to direct a verdict may have been made or overruled, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence.”
 

 AVe find no defect in the statements contained in the pleadings. Under Section 11601, G-eneral Code, the evidence which could be the basis of'a judgment
 
 non obstante veredicto
 
 must be such that reasonable minds could not reach different conclusions therefrom. Ohio Jurisprudence, 1943 Cumulative Supplement, page 2795, Judgments, Section 74.
 

 Both the pleadings and evidence in this case require the overruling of the motion
 
 non obstante veredicto.
 

 As the Court of Appeals passed upon but four of plaintiff’s thirteen assigned grounds of error, it will be necessary to remand the case to the Court of Appeals.
 

 Therefore, the judgment of the Court of Appeals should be and hereby is reversed and the cause remanded to that court for further proceedings according to law.
 

 Judgment reversed and catóse remanded.
 

 AVeygandt, C. J., Zimmerman, Bell, AVilliams, Matthias and Hart, JJ., concur.