Myrtle **FANNIN**, Administratrix of the Estate of Zeb Fannin, Deceased, Appellant,

v.

**BALTIMORE AND OHIO RAILROAD COMPANY**, Appellee.

No. 13260.

United States Court of Appeals Sixth Circuit.

Feb. 26, 1958.

Elmer I. Schwartz, Cleveland, Ohio (Metzenbaum & Schwartz, Cleveland, Ohio, Marcus L. Friedman, Toledo, Ohio, Joseph I. Williams, Cincinnati, Ohio, on the brief), for appellant.

Charles W. Peckinpaugh, Jr., Toledo, Ohio (Robert B. Gosline, Toledo, Ohio, of counsel; Shumaker, Loop & Kendrick, Toledo, Ohio, on the brief), for appellee.

Before MARTIN and McALLISTER, Circuit Judges, and MATHES, District Judge.

MARTIN, Circuit Judge.

This is an appeal from judgment entered on a directed verdict for the defendant in an action brought against appellee by the administratrix, widow of

decedent who was killed by a train of the defendant operated at a high rate of speed over the Sandusky River Bridge at Tiffin, Ohio. In his opinion, delivered from the bench in directing the jury, the United States District Judge discussed in some detail both the facts and the law which he deemed applicable to the facts. He held plaintiff's intestate to have been guilty of such contributory negligence as would preclude recovery by the administratrix and announced the further conclusion that there had been no negligence on the part of the railroad company which could be a proximate cause of the death of plaintiff's intestate.

Concededly, Ohio supplies the governing law of the case. In Biery v. Pennsylvania R. Co., 156 Ohio St. 75, 77, 78, 99 N.E.2d 895, 896, the law is thus stated: "The rule is well settled that upon a defendant's motion for a directed verdict, the trial court must construe the evidence most strongly in plaintiff's favor and submit the case to the jury if such evidence, with all inferences reasonably deducible therefrom, would permit reasonable minds to reach different conclusions with respect to those questions of fact essential to be proved by plaintiff. [Citing cases.]

"Another equally well established rule is that negligence is never presumed. In an action based on negligence, the presumption exists that each party was in the exercise of ordinary care, and such presumption prevails until rebutted by evidence to the contrary. [Citing cases]."

The first syllabus of Pope v. Mudge, 108 Ohio St. 192, 140 N.E. 501, asserts: "It is error for the court to direct a verdict against the plaintiff, where, by giving to the evidence the most favorable interpretation toward him which any of the evidence will reasonably warrant, there is some evidence tending to support the allegations of the petition." See also Douglas v. Daniels Bros. Coal Co., 135 Ohio St. 641, 650, 22 N.E.2d 195, 123 A.L.R. 761.

The Supreme Court of Ohio, in Amstutz v. Prudential Insurance Co. of America, 136 Ohio St. 404, 407, 408, 26 N.E.2d 454, 456, thus stated the criterion: "The general rule is that in passing upon a defendant's motion for a directed verdict, the trial court must treat as true all the evidence, together with any and all inferences which a jury may reasonably draw therefrom, in favor of the plaintiff; and 'if, after so treating the evidence, the court should find that reasonable minds may reach different conclusions as to any question of fact essential to the claim of the party against whom the motion is made, the motion should be denied and the case submitted to the jury. See Hamden Lodge v. Ohio Fuel Gas Co., 127 Ohio St. 469, 189 N.E. 246.' Wilson v. Peoples Ry. Co., 135 Ohio St. 547, at 552, 21 N.E.2d 860, 862." See also Purdy v. Kerentoff, 152 Ohio St. 391, 394, 89 N.E.2d 565; Douglas v. Daniels Bros. Co., 135 Ohio St. 641, 650, 22 N.E.2d 195, 123 A.L.R. 761.

Our colleague, United States Circuit Judge Allen, formerly a member of the Supreme Court of Ohio, thus stated the rule in Baltimore & Ohio Ry. Co. v. Henery, 6 Cir., 235 F.2d 770, 772, 773: "Under Ohio law, controlling here, the usual rule applies that a motion for a directed verdict amounts to an admission of all the facts which the evidence tends to prove. Moreover, the evidence is to be construed most strongly in favor of the party against whom the motion is made, Wilkeson v. Erskine & Son, Inc., 145 Ohio St. 218, 61 N.E.2d 201, 39 O.Jur., 799, Sections 182 and 183. See also Hamden Lodge, etc. v. Ohio Fuel Gas Co., 127 Ohio St. 469, 189 N.E. 246." See another opinion written by Judge Allen: Nieman v. Aetna Life Insurance Co., 6 Cir., 83 F.2d 753, 754; see also Begert v. Payne, 6 Cir., 274 F. 784.

We shall now undertake a brief review of the facts to be considered in the light of the legal principles stated. The decedent, Zeb Fannin, was at the time of the fatal accident a painter in the employ of a contracting firm which had undertaken to paint the bridge of the appellee railroad company over the Sandusky River

at Tiffin, Ohio. Although the painting of the bridge had been under way for several weeks, the decedent had commenced work on it only the day before he met his death. In cooperation with Richard Kilgore, another employee of the painting firm, the decedent was working underneath the bridge. They had strung three cables—one on each side and one in the middle—and two "picks," some twenty to twenty-two feet long, below the bridge. These picks were made like a ladder, with rungs over the top to which two-inch strip boards had been nailed.

When the decedent and the younger man, Kilgore, quit work on the day before the accident, the pick which they had been using was left about sixty feet from the east end of the bridge. It was strung crosswise in a northerly-southerly direction beneath the bridge. To get to the pick, Fannin and Kilgore had to step down onto a cross-piece and then on to the pick. The two men went to work about 6:45 on the morning of the accident.

The railroad tracks cross the bridge in an easterly-westerly direction and are comparatively straight until they reach a point some 700 or 800 feet west of the west end of the bridge. Whistle posts and yellow flags, indicating to approaching train crews that men were working on or about the bridge, had been placed both east and west of the bridge. Moreover, the railroad company had issued a bulletin to its employees to the effect that there were men working on the bridge. Admittedly, the appellee railroad company's own rules limited the maximum speed to 35 miles per hour for all trains passing over the particular bridge at Tiffin, Ohio. Appellee's train which struck and killed Fannin was, according to the testimony of Kilgore, traveling at sixty to seventy miles per hour when it passed him on the bridge. This was twice as fast as all other trains which he had observed passing over the bridge had traveled during the four or five weeks that he had worked on it. In fact, the speed of the train on the day of the fatal accident was so fast that—after

its two engines had passed him—Kilgore's hat was blown off his head.

Kilgore was the only witness who described the accident. He stated that he and the decedent had gone to work around 6:45 a. m. It was a clear day. After they arrived at the bridge, the two men unloaded from a truck, parked on the street at the west end of the bridge, the air hoses, paint buckets, and other tools needed for their work, and carried these implements onto the bridge to a point some sixty feet from its east end. Four separate trips were necessary to be made by them in order to complete this transportation. The air compressor being used by the men to operate the air hammers was located upon the street under the west end of the bridge and air hoses were run from this compressor underneath the bridge to the aforementioned point where they intended to start work.

The two men had just connected their air hammers to the hoses from the air compressor and were preparing to go beneath the bridge to the pick, when Kilgore heard a train whistle and exclaimed to Fannin: "There's a train coming." Fannin replied: "Yes, Dick, I hear it whistling." Kilgore looked toward the west, but did not see a train. He then walked eastwardly about 200 to 225 feet and took the hose off the track at a point about five feet from the west end of the bridge. After he walked about twenty feet on this mission, he turned around and saw Fannin picking up his paint bucket and some tools. The half-filled paint bucket weighed some twenty to twenty-five pounds and another bucket filled with the tools weighed ten or twelve pounds. Fannin crossed the tracks toward the south and the last time he was seen by Kilgore was standing on an extension built across the tracks.

Kilgore stated further that he had just taken the hose off the track when he saw a freight train, pulled by two engines and traveling—according to his estimate—at sixty or seventy miles per hour when it passed him. He was then standing on the "other track, that is, the west-

bound track." When he first saw the train coming around the bend, it started blowing its whistle and continued to do so for a long while.

After the train had passed, Kilgore returned toward the location of his pick for the purpose of going down and getting on it to begin work. Fannin was not in sight. Kilgore "hollered" for him, but received no answer. He then walked toward the east and observed red lead spattered on the bridge about twenty feet to the east of where he stood. The paint was splashed around and was "all over one of the rails." He next observed blood spattered around. He then looked down into the river and saw the decedent's body. Fannin was lying on his back with his left hand across his chest and his right hand stretched out across his leg. Kilgore started to jump into the river to rescue Fannin, but looked again and saw that his body was not moving. Kilgore then discovered on the bridge parts of decedent's body—both his eyes and some of his teeth and skull.

The district judge reasoned that the decedent apparently had made no attempt to go to the east end of the bridge, some 75 feet away, to a place of safety, nor to one or two places where steel refuse cans were situated—where a man could step up to a place of safety—nor had he stood on the board walk where Kilgore had left him and where he might have occupied a place of safety. The judge said: "For some reason unknown to any of us, he crossed the track upon which the train was coming and placed himself adjacent to the south rail of that track. He apparently, as Mr. Kilgore has testified, was down under the bridge or was making an effort to go down under the bridge to his scaffolding where his work would occupy him and was thus struck in the head by an overhang of the engine. That is the only conclusion that could be reached."

■ We do not concur in this reasoning as the basis for direction of a verdict for the defendant railroad company. First of all, we think the proof justified submission to the jury of the issue of defendant's negligence. The freight train was being operated at a speed approximately double that of the limitation of the carrier's own rule. The train crew was duly advised by signs and whistle posts at both approaches to the bridge that men were working on it. A bulletin had been issued to the train crews to that effect. Painting paraphernalia was on the bridge in the line of vision of the operators of the train. There was a curve some 700 to 800 feet from the west end of the bridge curtailing visibility. The engine crew, if keeping a careful lookout ahead, should have seen Kilgore as they approached the west end of the bridge.

In view of all these circumstances and by virtue of authorities which have been cited earlier in this opinion, the excessive speed of the train and the failure to lower it presented an issue of negligence for determination by the jury.

It is a reasonable inference that, when he met his death, Fannin was attempting to get down under the bridge to the pick where he would do his work. Apparently, the decedent almost reached a point of safety below the bridge before he was fatally struck. It should not be assumed that, when he first heard the whistle blow or when he first saw the approaching train, he would have any way of knowing that the train was approaching at such an excessive rate of speed. It is quite reasonable to assume that he considered that he had ample time to reach the position of safety where he was to work, and that probably he would have reached it had the train been going at 35 miles per hour.

The plaintiff's intestate may have had his progress toward the bridge impeded by his foot being caught in the ties, or he may have stumbled in some fashion, thus delaying his progress. All these possibilities could account for the fatal accident without attributing contributory negligence to the decedent.

■ It should be presumed that decedent was in the exercise of ordinary care and such presumption should prevail until rebutted by evidence to the contrary.

We do not find such evidence in the record. We think the trial court arrived at its conclusion by speculation as to what occurred without indulging the presumption, which the Supreme Court of Ohio says prevails until rebutted by evidence to the contrary, that plaintiff's intestate was exercising ordinary care. In our opinion, the case should have been submitted to the jury under proper instructions.

■ In our view, the trial court also erred in sustaining defendant's objections to plaintiff's interrogatories Nos. 2, 3, 4, 5 and 6. Civil Procedure Rule 33, 28 U.S.C.A., provides that interrogatories may relate to any matters the proper subject of inquiry under Rule 26 (b). Rule 26(b) is broad in coverage, in that, under it, a deponent may be examined with respect to "the identity and location of persons having knowledge of relevant facts;" and it is not ground for objection that the testimony will be inadmissible at the trial, if the testimony sought appears reasonably calculated to lead to discovery of admissible evidence.

The judgment is reversed and the case is remanded for a new trial.

Finnegan and Schnackenberg, Circuit Judges, dissented in part.