DUNCAN, In re: COMMONWEALTH OF PENNSYLVANIA, Plaintiff-Appellee, v. DUNCAN, Defendant-Appellant.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 25334.   Decided February 21, 1961.

Mr. John T. Corrigan, prosecuting attorney, and Mr. Joseph Pietrafese, assistant prosecuting attorney, for plaintiff-appellee.

Messrs. Danaceau, Cohn & Brown, Mr. Armand I. Cohn, of counsel, for defendant-appellant.

For further history see *Omnibus Index* in bound volume.

SKEEL, J. This appeal comes to this court on questions of law from an order of the Court of Common Pleas of Cuyahoga County, directing the defendant to pay into court the amount of ten dollars a week for support of a minor child said to be the child of the defendant. The order for support was made under the Uniform Support of Dependents Acts of Ohio and Pennsylvania.

The issues tried by the Court of Common Pleas of Cuyahoga County, that is the court of the responding state under the Uniform Support of Dependents Act, are made up by the complaint filed in Fayette County, Pennsylvania, where, upon hearing, a certificate of the proceeding was certified by the trial judge to the Court of Common Pleas of this county, the defendant's answer, which is a specific denial of every allegation of the complaint, and the complainant's reply. Upon hearing of the complaint in the initiating state, the court, upon the evidence presented, as provided by the Uniform Support of

Dependents Act, found that the defendant owed the obligation of support to Michael Duncan. The court certified to the respondent court the evidence that was taken before it on the complaint, a part of which is quoted below as is some of the testimony of the defendant, all of which is before this court by a bill of exceptions, which, with the evidence and exhibits set out and certified in the complaint, constitutes the evidence upon which the trial of the issues was had.

The evidence shows that. the defendant was married to Marie Gale Duncan on August 23, 1941. In 1951, the defendant was apparently separated from his wife and living in Pittsburgh, Pennsylvania. Sometime prior to. November 9, 1951, he became a roomer in the home of the mother of the plaintiff. On November 9, the defendant entered into a ceremonial marriage with the plaintiff, Elma Duncan, at Fairmount, West Virginia. His testimony concerning his status with his first wife at the time of the second marriage is uncertain and contradictory. The record discloses the defendant's testimony as follows:

"* * * so I dated her. Later on she said she was pregnant.

"THE COURT: She said what?

"THE WITNESS: That she was pregnant. She said, well, I have to do something about it, so she said we would have to get married. I said: 'Well, I don't have any divorce.' At the time, my wife and I—my wife had gone on a vacation. She said she was pregnant so the only thing I could do was marry her."

* * *

"Q. When she told you she was pregnant, what happened?

"A. She said she was pregnant, said we have to do something about it. She said 'The only thing we can do is get married,' so we proceeded to get married."

Upon cross-examination, the defendant admitted relations with the plaintiff before they were married and that he continued to live in the family residence at least three weeks after the ceremonial marriage. The record then shows the defendant testified, after a question regarding the relations of the parties, to the following:

"A. She said she was pregnant. My wife, which when I

was separated, a divorce was pending, *she found a divorce had been granted*. She had known before I said I'm going to get out of here because it is not right being married to two women. I knew that and she knew it." (Emphasis added.)

The testimony of the defendant as to the time he separated from the plaintiff is in conflict with that of the plaintiff. His contention is (as indicated) that he did not remain in the home of the plaintiff's mother more than three weeks after the ceremonial marriage which took place in Fairmount, West Virginia, on November 9, 1951. The testimony of the plaintiff, taken before the Presiding Judge of Fayette County, Pennsylvania, and sworn to by the plaintiff, is to the effect that the defendant remained in the house of the plaintiff and her mother from and after the ceremonial marriage until March 15, 1952. Her testimony, in part, was:

"Q. What were the circumstances of your husband leaving the family home?

"A. Our marriage was a bigamist one and we separated because of the trouble over this.

"Q. When and how much was his last contribution for support?

"A. April of 1952, he sent me $35.00."

The child, Michael Duncan was born September 24, 1952.

There is no evidence other than that of the defendant to the effect that the complainant had knowledge of the defendant's prior marriage at the time of the ceremonial marriage. It seems unlikely that the defendant, if he was in fact previously married and not divorced, would deliberately commit such a serious crime and make public declaration of his criminal conduct as is shown by his testimony and then abandon his second wife in such a short time without apparent cause. The circumstances surrounding the defendant's conduct with regard to his relations with the plaintiff, give some weight to his sworn statement that he had been divorced from his first wife when the second marriage took place. This testimony (of the decree in divorce) seems to have been completely overlooked in presenting this proceeding. The defendant, by his specific denial in his answer of every claim of the plaintiff is in direct conflict with his sworn testimony as a witness in the case. His

credibility is, therefore, challenged to a point where it is worthy of little or no credence.

The trial of an action under the Uniform Support of Dependents Act is conducted under dual jurisdictions. This is so of necessity where the purpose to be accomplished by the Act is to compel, by judicial process, one owing the duty of support to a dependent and who has abandoned those whom it is his duty to support and has moved from the state of the dependent's domicile. Under the provisions of the Uniform Support of Dependents Act, process is provided whereby such dependent may institute a proceeding to enforce the duty of support at the domicile of the dependent (the obligee), through which action jurisdiction over the defendant may be acquired by certifying the proceeding of the initiating state to the place of the domicile of the one in default of support, that is, the (obligor), in another state. The widespread acceptance of such proceeding by the states of the Union clearly indicates a basic public policy establishing these proceedings as a proper way to meet an ever increasing social problem.

In an article dealing with the Uniform Support of Dependents Act in 45 Illinois Law Review, page 262, the author summarizes his conclusions respecting this Act as follows:

"To look upon the Uniform Support of Dependents Act as merely one more attempt to meet the legal problems of family desertion is to interpret its significance too narrowly. In a broader sense, it is a visionary effort to solve the problems of multiple sovereignties in a highly mobilized society where doctrines of personal jurisdiction and full faith and credit have failed to give practical effect to legal rights. Wherever these problems combine, the reciprocal machinery sponsored here offers a hopeful legal approach. Because of this, considerable emphasis has been devoted to demonstrating that there are no insuperable constitutional problems inherent in the reciprocal procedure.

"The new act offers hope to deserted dependents who have remained helplessly entangled in procedural webs spun through a framework of forty-eight state sovereignties. The system of multiple sovereignties has values which we are committed to preserve. But if this is to be done, lawmakers and the judi-

ciary must meet the challenge of devising legal techniques which give realistic protection to individual rights without compromising the separate sovereign powers. Progress and experimentation are the essence of this challenge."

The certificate received from the initiating state is clearly admissible as the declaration under oath of the claimant under the provisions of the law.

Section 3115.01, paragraph (F), Revised Code, provides:

" 'Duty of Support' means any duty of support imposed or imposable by law, court order, or decree, or judgment, whether interlocutory or final, and whether incidental to a proceeding of divorce, legal separation, separate maintenance, or otherwise."

Section 3115.03, Revised Code, provides:

"Duties of support enforceable in accordance with Sections 3115.01 to 3115.22, inclusive, Revised Code, are those imposed by the laws of any state where the alleged obligor was present during the period for which support is sought. * * *."

Section 3115.06, Revised Code, provides that the petition in an action to enforce support shall be verified stating the name, address, and circumstances of the defendant and his dependants for whom support is sought and shall state all other pertinent information.

Section 3115.07, Revised Code, provides that when a petition mentioned in Section 3115.06, Revised Code, is filed (instituted) in this state, the court shall determine from the facts set forth in the petition if the defendant owes a duty of support and shall certify the transcript to the responding state.

Section 3115.08, Revised Code, provides that when a court of this state acts as a responding state and receives the petition as provided by Section 3115.07, Revised Code, the case shall be docketed and the action proceed as therein set out in this section.

As required by the foregoing sections of the Revised Code, the court of the initiating state must find that the obligor owes the duty of support before certifying the petition to the responding state and the responding state, upon hearing, must also find such duty of the obligor under the laws of the responding state. In the case of *The Commonwealth of Pennsylvania,*

*etc.*. v. *Mong*, 160 Ohio St., 455, 117 N. E. 2d, 32, in considering the duty of a child to support his father, the suit being under the Uniform Support of Dependents Act, held:

"In a proceeding, initiated in Pennsylvania and certified to Ohio under the provisions of the 'Uniform Dependents Act' (Act No. 50 [1951] of the General Assembly of Pennsylvania: Sections 8007-1 to 8007-19, General Code), to require a son, who is a citizen and resident of Ohio, to contribute to the support of his father, who is a resident of Pennsylvania, the courts of Ohio will determine the liability of such son for such support in accordance with the law of Ohio and, in so doing, will accord to such son any benefit of Section 12431, General Code, to which he may be entitled."

Both courts, upon hearing the evidence presented in their respective proceedings, found that this defendant owed the duty of support to Michael Duncan.

The defendant contends that since Michael Duncan is alleged to have been born of a bigamous marriage, the defendant cannot be held liable for Michael's support until "it is determined in a bastardy proceeding in juvenile court that the defendant is, in fact, the actual father of Michael Duncan."

There is also a claim of error based on the overruling of defendant's motion for a "directed verdict" at the end of the plaintiff's case. This claim cannot now be considered because the defendant, after such motion was overruled, put on his defense. We, therefore, must look to the entire record in passing on the defendant's remaining claims of error. *McKelleps* v. *Ind. Comm.*, 145 Ohio St., 79, 60 N. E. 2d, 667.

This question was decided in the case of *Wilkeson* v. *Erskine & Son*, 145 Ohio St., 218, 61 N. E. 2d, 201, where the court said:

"1. Where defendant's motion to direct a verdict in its favor made at the close of plaintiff's evidence is overruled and defendant thereafter proceeds to introduce evidence, any error in the overruling of such motion is thereby waived."

If it be concluded from the defendant's testimony that a divorce had been granted to the defendant's first wife before the intermarriage of the parties to this action on November 9, 1951, a conclusion which is clearly supported by the defendant's sworn testimony, then there can be no question about the obli-

gation of the defendant to support a son born during lawful wedlock. But if the trial court concluded that a divorce had not been granted, then the question of the liability of the defendant to support a child, born after a bigamous marriage had been consummated, must be resolved.

The facts of this case cannot be controlled by the case of *Creisar* v. *State*, 97 Ohio St., 16, 119 N. E., 128, where the Supreme Court reversed a finding of guilty of a defendant tried in the juvenile court for the non-support of a bastard child under Section 1655, General Code. The court said in the syllabus:

"The term 'minor' found in Section 1655, General Code (103 O. L., 873), should receive its ordinary legal signification, and so construed embraces only minor children who are legitimate. The juvenile court acting under that section has no authority to proceed and punish the father of an illegitimate child, unless its paternity has been acknowledged after intermarriage in conformity to Section 8591, General Code."

There is a clear distinction between the legal rights of an illegitimate child and one born of a bigamous marriage. The Supreme Court, in the case of *Eggleston* v. *Eggleston*, 156 Ohio St., 422, 103 N. E. 2d, 395, had for consideration the manner in which a bigamous marriage is to be dissolved. The court clearly held that a suit to annul such marriage could not be maintained. The syllabus of the case provides:

"1. Section 11979, General Code, authorizing the granting of a divorce where 'either party had a husband or wife living at the time of the marriage from which the divorce is sought,' provides an exclusive remedy in cases involving that situation.

"2. Where a decree of divorce is granted on the petition of a woman on the ground that the defendant had a wife living at the time of his marriage with the plaintiff, the court has jurisdiction to grant to the plaintiff alimony and other relief authorized by the statutes on divorce and alimony."

If the rights of a wife to a bigamous marriage to receive alimony is thus determined, the rights of a child born during and of such relationship should be equally protected. A proceeding in bastardy under the law of the Eggleston case would not be available to the mother.

If Michael Duncan is, in fact, the child of the plaintiff and defendant, who were united in a bigamous marriage before he was conceived (the record contains sufficient evidence to justify the trial court in finding that such is the fact), then the defendant's duty of support is provided for and imposed upon him under either one of two statutes, that is, Section 2903.08 or Section 3113.01, Revised Code.

The first of these sections is in Chapter 2903, Revised Code, entitled "Offenses Against Minors" and the second is in Chapter 3113, Revised Code, entitled "Neglect and Abandonment of Dependents." Section 2903.08, Revised Code, in part, provides:

"No person having the control of or being the parent or guardian of a child under the age of sixteen years shall willfully abandon such child, or torture, torment, or cruelly or unlawfully punish him, or willfully or negligently fail to furnish him necessary and proper food, clothing, or shelter."

In defining a parent's duty under this section, the Court of Appeals said in the case of *State* v. *Medley*, 111 Ohio App., 352 (1960):

"1. The offense of nonsupport of a child under the age of 16, prescribed by Section 2903.08, Revised Code, is a misdemeanor, of which the Municipal Court has jurisdiction.

"2. The determination of paternity in a bastardy proceeding is not a prerequisite to the prosecution of a parent, under the provisions of Section 2903.08, Revised Code, for non-support of an illegitimate child."

The charge in this case was the failure to support two illegitimate children under sixteen years of age.

Section 3113.01, Revised Code, provides:

"No parent or other person charged with the maintenance of a legitimate or illegitimate child under eighteen years of age, or of a physically or mentally handicapped child under twenty-one years of age, nor the husband of a pregnant woman, living in this state, shall fail to provide such child or woman with the necessary or proper home, care, food, and clothing."

In the case of *State* v. *Schwartz*, 137 Ohio St., 371, 30 N. E. 2d, 551, the court had for consideration a charge by indictment alleging that the defendant, Melvin Schwartz, failed to provide for the support of an illegitimate child. He had pre-

viously been a defendant in a bastardy proceeding in which he was charged with being the father of the child which proceeding resulted in a judgment of not guilty. The Supreme Court said in the first paragraph of the syllabus:

"1. An adjudication in a bastardy proceeding is not conclusive upon the state unless expressly made so by statute, and the state has the power to prosecute criminal proceedings for nonsupport of an illegitimate child at any time, before, after and independently of an adjudication in a bastardy proceeding and wholly independently of any finding therein made, or judgment therein rendered, with respect to the question of paternity."

It seems perfectly clear that under the evidence and the law of the cases cited, the judgment of the Court of Common Pleas should be and is affirmed.

Judgment affirmed.

KOVACHY, P. J., HURD, J., concur.