KRAMP ET AL., APPELLANTS, *v.* THE TOLEDO EDISON
CO. ET AL., APPELLEES.*

(No. 5364—Decided February 6, 1961.)

*Mr. A. R. Kipperman* and *Mr. M. K. Jacobs*, for appellants.
*Messrs. Fuller, Harrington, Seney & Henry* and *Messrs.
Boggs, Boggs & Boggs*, for appellees.

DEEDS, J. This is an appeal on questions of law from a
judgment of the Common Pleas Court rendered following a
verdict of a jury directed at the close of plaintiffs' evidence.

The action was commenced by plaintiffs, appellants herein,
to recover damages for alleged trespass by defendants, appel-
lees herein, upon real property which it is alleged was the prop-
erty of plaintiffs.

The parties will be referred to herein as plaintiffs and de-
fendants, respectively, as they appeared in the trial court.

Plaintiffs allege in the petition filed in the Court of Com-

---

*Motion to certify the record overruled, May 17, 1961.

mon Pleas that they were the owners of certain real property described as follows:

"The west quarter (¼) of the southwest quarter (¼) of the southeast quarter (¼) of section number four (4), town nine (9) south, range seven (7) east, in Washington Township, Lucas County, Ohio."

Plaintiffs allege further, in part, as follows:

"3. That from the date of purchase of this real property there was growing on the westerly side of said property a good many trees, some of which were saplings at time of purchase; that during and through the years of plaintiffs' uninterrupted possession, use, occupancy and quiet enjoyment of said property, they cared for and nurtured said trees, including thinning and trimming them from time to time and cleaning and removing the brush therefrom, until said trees became tall and stately and formed a beautiful landscape as well as a windbreaker from the westerly side of said land as well as forming a screen from the adjoining land.

"4. That on or about the 21st day of May, 1957, the defendant The Toledo Edison Company, by and through its agent, the defendant The Davey Tree Expert Company, without the consent of plaintiffs or either of them, unlawfully entered upon said land of the plaintiffs and then and there cut down, carried away twenty-seven (27) trees of various sizes, heights and types including maples, oaks and ash."

Plaintiffs pray for damages in the amount of $100,000.

The plaintiffs amended the petition by deleting certain words and phrases, pursuant to the order of the court.

Defendants filed separate answers to the amended petition, in which defendants deny that plaintiffs were the owners or in possession, or both, of the real property upon which the trees described in the amended petition were located.

The fourth and fifth defenses contained in the answer of the defendant The Davey Tree Expert Company are as follows:

"Fourth Defense.

"7. This defendant denies that at the time set forth in plaintiffs' amended petition or at any other time it trespassed or entered into or upon the lands or real estate of plaintiffs described in the amended petition.

"Fifth Defense.

"8. This defendant further says that on or about the 21st day of May, 1957, it entered upon certain lands located in Washington Township, Lucas County, Ohio, on which premises the defendant, The Toledo Edison Company was grantee of an easement, and that at the request of the defendant The Toledo Edison Company, it removed certain trees from the premises covered by said easement."

Plaintiffs have filed the following assignments of error:

"1. The court erred to the prejudice of the appellants and abused its discretion in granting defendants' motions to strike.

"2. The court erred to the prejudice of the appellants and abused its discretion in not allowing certain proof into evidence.

"3. The trial court erred to the prejudice of the rights of the plaintiffs-appellants in granting defendants-appellees' motions for a directed verdict which was clearly against the manifest weight of the evidence."

The issue determinative of this appeal is whether there is substantial evidence in the record tending to establish plaintiffs' cause of action as alleged in the amended petition. The removal of the 27 trees involved is not in dispute, the issue is whether the trees were within the westerly boundary line of plaintiffs' property.

We are required to consider and "construe the evidence most strongly in favor" of the plaintiffs.

The principal question in the cause is whether the plaintiffs were the owners of the 27 trees and the land upon which the trees grew, or whether, as is alleged, the defendant The Toledo Edison Company was the grantee of an easement upon that land.

The rule of law governing a decision on this appeal is stated, as follows, in the opinion in *Durham* v. *Warner Elevator Mfg. Co.*, 166 Ohio St., 31, 139 N. E. (2d), 10, at page 36:

"Zimmerman, J. At the outset, we note the established rule that in the face of a motion to direct the jury to return a verdict for one of the parties to an action, which in effect is a demurrer to the evidence, the court must construe the evidence most strongly in favor of the party against whom the motion is made, and, where there is substantial competent evidence to support his side of the case, upon which reasonable minds may

reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in disposing of such a motion. *Wilkeson, Admr.,* v. *Erskine & Son, Inc.,* 145 Ohio St., 218, 61 N. E. (2d), 201; *Hilleary* v. *Bromley,* 146 Ohio St., 212, 221, 64 N. E. (2d), 832, 837; *Purdy, Admr.,* v. *Kerentoff,* 152 Ohio St., 391, 89 N. E. (2d), 565.''

The parcel of real property owned by the plaintiffs consists of about 10 acres fronting upon Alexis Road in Washington Township, Lucas County.

The controversy is with reference to the location of the westerly boundary line of plaintiffs' property; which boundary line extends in a northerly and southerly direction.

The plaintiff Victor J. Kramp testified that plaintiffs had the property surveyed in the year 1930; that following the survey plaintiffs took possession and assumed control of the land upon which the 27 trees in question were located. The testimony of the plaintiffs is to the effect that, after the survey in the year 1930, the plaintiff Victor J. Kramp placed and maintained a line of posts, extending in a northerly and southerly direction, which indicated that plaintiffs' westerly property line included the 27 trees and the land upon which the trees grew, and that thereafter plaintiffs exercised control over and occupied that part of the premises by regularly caring for the trees and mowing the grass about the trees for a period of almost 30 years.

The testimony of the plaintiff Victor J. Kramp was corroborated by the testimony of the plaintiff Emma Kramp.

It is our view that there is substantial evidence in the record tending to establish that plaintiffs occupied and had possession of the premises, including the 27 trees in question, continuously for many years prior to the commencement of the instant action.

It is the contention of counsel for the defendants that evidence tending to establish possession of the premises by the plaintiffs is irrelevant and is of no value in establishing plaintiffs' alleged cause of action against the defendants, unless and until plaintiffs have proved and established plaintiffs' westerly boundary line, in accordance with the legal description of plaintiffs' property as alleged and described in the amended petition.

The plaintiffs called a surveyor as a witness, who testified that at the request of the plaintiffs he completed a survey of their property.

The witness, one Charles W. Mayers, testified that he was chief surveyor in the office of the Lucas County engineer; that he had held that position for 12 years; that he received an A. B. degree from St. John's University in 1916 and also had finished a night I. C. S. course in surveying and engineering; that he had performed work as a surveyor for various contractors, including a survey for a pipeline through Indiana, Illinois and Kentucky for the Bentley firm of contractors; that he started as a rod man in the county engineer's office and had worked through all the positions to his present position; that he had been a registered surveyor in Ohio since the law first required registration in about 1934; and that he had charge of surveying for the commissioners, the school board, the township trustees and the other commissions in Lucas County.

He testified further that the work of surveying was performed by crews under his direction.

He testified that he started the survey for the plaintiffs by securing the legal description of the plaintiffs' property from a deed or abstract, and then testified further, in part, as follows:

"Q. And following his request, what did you do? A. Well, I checked up on the adjoining properties and so on in that particular section, and also on the section monuments and other points that we might be interested in as far as making a survey was concerned, different measurements, and then I turned the information I obtained over to the field crew.

"Q. In making the survey, Mr. Mayers, do you have occasion to keep records of these surveys. A. Yes, we keep records.

"Q. And normally where do you keep your records of these things? A. Well, for the last several years, I have kept them in an engineer's field book.

"Mr. Jacobs: Would you mark this book as plaintiffs' exhibit No. 6, please. (Plaintiffs' exhibit No. 6, a field book, the property of Charles W. Mayers, was marked for identification by the reporter.)

"Q. Mr. Mayers I hand you plaintiffs' exhibit No. 6, and would you identify that please? A. Yes, this is the notebook I used, No. 7, which is the 7th one I have used since I kept records.

"Q. And in that notebook, did you make any notations as to the survey that was requested by the Kramps? A. Yes. I believe this was the one (indicating). Yes, we have the notes here starting on page 54.

"Q. And after you completed this survey did you have occasion to give Mr. and Mrs. Kramp any evidence of what you found as the dimensions of the property? A. Yes, I usually draw up a sketch and turn it over to them.

"Q. And I hand you plaintiffs' exhibit No. 3, and can you identify that document? A. Yes, that looks like one I drew up but it doesn't have my seal on it but this may have been a copy which was made later on but this is it.

"Q. That is the dimensions of the property as computed and drawn, based on the survey which you prepared? A. That is correct.

"Q. In preparing this survey, how many men assisted you? A. Well, there was, I think, three besides myself at one time and then four others at another time.

"Q. Can you recall what their names are and what their particular jobs were? A. Yes, there was, I believe the first day we went out there, according to the notes, was February 9, 1957, Robert Gallemore, William Gust and Meredith Freels with me, and then we got started on this survey and did some work, and then on February 12th, I had John Liwo out there in addition to the other three.

"Q. What jobs did each of those men perform. A. Well, they worked interchangeably. There is not any rigid distinction between what one man does and another man does particularly. Now, when I am out with the crew I usually keep the notes but as far as the rest are concerned, and the chief of party does, which in this case was Liwo, he probably kept the notes, although any of the others might have also. It depends on just how you are working and we all make measurements and we all hold the rods and we all use the instruments. We are all experienced in the mechanics of surveying so we work interchangeably, so that way I cannot say hard and fast just exactly who did what.

"Q. Who selected this crew that assisted you? A. I do.

"Q. Where are those men employed? A. They are all employed by the county and we do this work on our own time.

"Q. February the 9th, 1957, do you recall what day of the week that was? A. Yes, that was a Saturday.

"Q. And February the 12th, 1957? A. That was Lincoln's birthday.

"Q. And you had time off from the county work at that time? A. Yes, sir.

"Q. Would you tell the jury how you surveyed this property, this particular property? A. Tell them how we surveyed it?

"Mr. Snyder: Excuse me, may I just ask that the question be clarified so that Mr. Mayers makes it clear what he did personally? Is that what you intend by the question, Counsel?

"The Court: Yes, what you did when you were there, Charles. A. Well, you are asking me a hard question. I can not recall all I did or do while I was there. I was not out there the whole time. You understand, I directed them, I got them the necessary information and the number of points that they should check up on by measurement and so on, and when I was out there I was just watching to see that they were following my directions. Now, just how much of the actual measuring or any of the rest of it that I did I cannot tell you offhand. That is, the actual physical work because I don't know how much I did personally. But, my main job was in directing the work of that field crew.

"Q. And then the field crew submitted the measurements to you, is that right? A. Yes.

"Q. And you prepared the drawing? A. That is correct. I checked them over and prepared the drawing, yes.

"Q. In determining the southwest corner of the property, how was that arrived at? A. The southwest corner, why that was arrived at by measuring from a monument at the southwest corner of the section which is a concrete monument with a brass plate at the center of the intersection of Douglas Road and Alexis Road, measuring from there east to a concrete monument with a plate in it at the center of the intersection of Jackman Road and Alexis Road and splitting that distance to arrive at the quarter corner, that was the way, and then that would be at the quarter corner. Then, to arrive—well, and that would be the southwest corner of the property, the center of Alexis Road.

"Q. Were there any monuments that you were able to locate in that particular area? A. Yes, there was some monuments in the subdivision in the northwest corner of Jackman Road and in the subdivision at the northeast corner of Douglas Road and Alexis.

"Q. And were there any monuments that you were able to locate on Alexis Road at or about the point you determined as the quarter corner? A. Well, we had some years before had a cross chiselled in the concrete pavement; that was after the state had paved that, and then at the time when we were out there we found a tack at that point which we used at the exact split and on the center of Alexis Road.

"Q. The point was determined by measuring the distance from Douglas Road to Jackman Road on Alexis Road, and was that point—or, did that point conform to the point that you found at the tack? A. It didn't conform exactly, it was about four or five hundredths of a foot off, the tack was. And, it was in a crack with tar probably and had been moved slightly by the movement of traffic.

"Q. The measurement that was taken along Alexis Road, would you describe to the jury how accurate you consider that measurement, Mr. Mayer? A. Well, we consider it fairly accurate. I would say if you want to consider temperature correction and difference in elevation as correction on your tape I couldn't tell you just exactly how that would hit but our center point did hit the same point that had been used by three or four other surveyors.

"Q. Now, calling your attention to the northwest point, northwest corner of the Kramp property. A. The northwest corner of the Kramp property?

"Q. How did you arrive at that point? A. Well, we found a pipe up there, an old pipe up there and we started checking east and west to verify it."

Three of the members of the crew who worked under the direction of Surveyor Mayers in completing the survey of the plaintiffs' property testified concerning the work which they performed in making the survey. They were employed in surveying work of the Lucas County engineer's office, and their experience had been from 10 to 18 years in that office.

Mayers testified that he had consulted county records, maps

and obtained information from other sources in completing the survey of the plaintiffs' property.

We have carefully examined all the evidence in the record, including the extended cross-examination of Mayers by able counsel for the defendants, and do not consider that a detailed analysis of all the testimony would serve any purpose in this opinion. We consider it sufficient to note here that the testimony of Mayers and the members of his surveying crew did explain the methods pursued and sources of information relied upon in determining the boundary lines and dimensions of the property described in the amended petition.

We quote an additional pertinent portion of the examination of Mayers, as follows:

"Q. Mr. Mayers, the method which was used in performing this survey, did you give an opinion as to the degree of accuracy in inches that this survey was performed?

"Mr. Snyder: Objection.

"The Court: Yes, I think the objection is well taken, Mr. Jacobs. Now, if you wish to make a profert and if you know what his answer will be then you may profert his answer. But, you have got to know what the witness will have said to make the offer to prove.

"Mr. Jacobs: (offer to prove) Plaintiff takes exception to the ruling of the court in not permitting the witness to testify as to the degree of accuracy of the survey on the Kramp property. If plaintiff was permitted to testify he would testify that this survey was done with an accuracy of four to six inches and if he was permitted to testify he would have so testified.

"Q. Now, Mr. Mayers, if you were called upon by the county to survey the legal description that was given you for the Kramp property, assume that the county has purchased this property for a park, would you have performed or ordered your men to perform this survey any differently?

"Mr. Snyder: Your Honor, I am not sure that that is in rebuttal to my cross-examination. Now, as I remember my cross-examination, I asked him if he was asked to locate the north and south centerline of the section, which everyone agrees is the west boundary of the Kramp property, whether he would have used the same method, and he answered that no. Now, as I understand these other boundaries of the Kramp property are not in dispute, and I did not ask any questions relative to

any other boundaries other than the west boundary in my cross-examination, and therefore I am going to have to object to this question on the basis that it is not in rebuttal.

"The Court: I think you are correct but I will overrule your objection and let him answer. A. As I understand your question, it is whether I would have changed my method, used a different method, is that the question?

"Q. That is correct? A. No, I would have used the same method on that regardless of what it was for or who it was for. I would have used the same method to survey that parcel."

It is our view that as a result of education, experience and the performance of public work as a surveyor, Mayers was a qualified expert, and that, therefore, he should have been allowed to testify concerning the accuracy of the survey which he had made of the plaintiffs' property.

We have the definite impression, after detailed examination of his testimony, that Mayers was entirely familiar with the requirements of the law applicable to surveys in this state, and that he completed the survey with regard to those settled rules as he understood them. The law is well settled that his credibility as a witness and the weight of his testimony were questions for a jury and not for the court.

The principles of law applicable to surveys are found in the opinion in *Broadsword* v. *Kauer, Dir.*, 161 Ohio St., 524, 120 N. E. (2d), 111, at pages 533, 534:

"It is well settled that monuments are of prime importance in settling boundary disputes. The general rule is well stated in 6 Thompson on Real Property (Perm. Ed.), 519, Section 3327, as follows:

" 'A "monument" is a tangible landmark, and monuments, as a general rule, prevail over courses and distances for the purpose of determining the location of a boundary, even though this means either the shortening or lengthening of distance, unless the result would be absurd and one clearly not intended, or all of the facts and circumstances show that the call for course and distance is more reliable than the call for monuments. This rule does not apply when it is evident that the call for a natural object or established boundary line was made under a mistaken belief with reference to the survey. Generally, in determining boundaries, natural and permanent monuments are the most

satisfactory evidence and control all other means of description, in the absence of which the following calls are resorted to, and generally in the order stated: First, natural boundaries; second, artificial marks; third, adjacent boundaries; fourth, course and distance, course controlling distance, or distance course, according to circumstances. Area is the weakest of all means of description. The ground of the rule is that mistakes are deemed more likely to occur with respect to courses and distances than in regard to objects which are visible and permanent. The reason assigned for this rule is that monuments are considered more reliable evidence than courses and distances. A description by course and distance is regarded as the most uncertain kind of description, because mistakes are liable to occur in the making of the survey, in entering the minutes of it, and in copying the same from the fieldbook. ''Consequently, if marked trees and marked corners be found conformably to the calls of the patent, or if watercourses be called for in the patent, or mountains or other natural objects, distances must be lengthened or shortened and courses varied so as to conform to those objects.'' When it comes to courses and distances, the latter yield to the former.'

''The trial courts of Ohio have long followed the principles announced above as is indicated by the discussion and citations contained in 5 Ohio Jurisprudence, 741 to 748, Boundaries, Sections 38 to 44.''

We also find the following pertinent statement with citation of authorities on the question of possession being evidence of title in the opinion in the *Broadsword case*, at page 535:

''Another important fact is that the plaintiff was in possession of the disputed premises when this controversy arose and when this action was instituted. He and his predecessors had been in possession for many years. In the absence of proof to the contrary the law presumes that possession of property peaceably acquired is lawful. *Sabareigo* v. *Maverick*, 124 U. S., 261, 297, 31 L. Ed., 430, 444, 8 S. Ct., 461, 480. The fact that the plaintiff was in possession of the real estate, exercising rights of ownership and performing acts of dominion, creates a rebuttable presumption that he was invested with some right or title in the premises. 9 Wigmore on Evidence (3 Ed.), 425, Section 2515; 20 American Jurisprudence, 230, Evidence, Sec-

tion 235; Sedgwick & Wait on Trial of Title to Land (2 Ed.), 545, Chapter 27; *Carlton County F. M. Ins. Co.* v. *Foley Bros.*, 117 Minn., 59, 134 N. W., 309, 38 L. R. A. (N. S.), 175; *Teass* v. *City of St. Albans*, 38 W. Va., 1, 17 S. E., 400, 19 L. R. A., 802; *Lessee of Ludlow's Heirs* v. *McBride*, 3 Ohio, 241, 255. See, also, *Harman* v. *Kelley*, 14 Ohio, 502, 45 Am. Dec., 552.''

. We consider the testimony of Mayers that he consulted records for certain information significant, in view of Section 315.25, Revised Code, which provides:

''The county engineer shall make and keep, in a book provided for that purpose, an accurate record of all surveys made by him or his deputies for the purpose of locating any land or road lines, or fixing any corner or monument by which it may be determined, whether official or otherwise. Such surveys shall include corners, distances, azimuths, angles, calculations, plats and a description of the monuments set up, with such references thereto as will aid in finding the names of the parties for whom the surveys are made, and the date of making such surveys. Such book shall be kept as a public record by the engineer at his office, and it shall be at all proper times open to inspection and examination by all persons interested therein. Any other surveys made in the county by competent surveyors, certified by such surveyor to be correct and deemed worthy of preservation, may, by order of the board of county commissioners, be recorded by the engineer.'' .  .

See, also, 8 American Jurisprudence, Boundaries, Section 93, ''Evidence of Correct Location of Monuments,'' and Section 95, ''Hearsay Evidence Generally.''

We conclude that the survey completed by the expert witness, Mayers, was substantial evidence tending to establish the western boundary line of the plaintiffs' property, and that the 27 trees and land upon which they grew were within that boundary line.

We determine, therefore, that there is substantial evidence in the record before us, tending to establish that plaintiffs were continuously in possession of the premises upon which the 27 trees in question grew, on and after the year 1930, and also that there is substantial evidence tending to prove that the 27 trees and land upon which they grew were within the westerly boundary line of the plaintiffs' property.

We find plaintiffs' assignments of error one and two not well taken, and the same are overruled.

Plaintiffs' assignment of error number three is sustained.

For the reasons stated, the judgment of the Court of Common Pleas is reversed and the cause remanded for a new trial.

*Judgment reversed.*

FESS and SMITH, JJ., concur.