SELLMAN ET AL., APPELLANTS, *v.* SCHAAF ET AL., APPELLEES.

(No. 1087—Decided April 7, 1971.)

*Messrs. McCulloch, Felger, Fite & Gutmann,* and *Messrs. Smith & Smith,* for appellants.

*Messrs. Schlafman & Elliott, Mr. James R. Goslee,* and *Mr. John B. Kelly,* for appellees.

Cole, J. Sometime prior to November 28, 1944, in October and November, Walter R. Toy, a surveyor, surveyed a portion of Seminole Island and thereafter on that date certified to a plat predicated upon this survey indicating "all lots have been staked; monuments and new galvanized iron pipes are being placed on the ground at the points indicated on the plats." The subdivision was entitled Seminole Shores Subdivision No. 2. In fact, difficulties arose and not all monuments and pipes were placed. Nevertheless on November 30, 1944, Harry E. Johnson and John P. Schooley, the then owners of the land so surveyed, dedicated the streets, drives and parks to public use and on the 11th of December, 1944, the plat was approved and accepted by the Logan County Commission. It was filed for record with the Recorder of Logan County on December 20, 1944.

Subsequently, Harry E. Johnson, the then sole owner, sold and transferred to Charles M. and Winifred Grafelman Lot 85 in Seminole Shores Subdivision No. 2 as shown on the recorded plat thereof, recorded in Book C, page 34, Plat Records of Logan County, Ohio. The deed was dated August 26, 1950, but was not transferred and recorded until July 26, 1951.

By a similar transaction, Harry E. Johnson sold and transferred to Ralph D. and Maude M. Leatherman Lot 86 in the same subdivision. This deed was also dated August 26, 1950. It was, however, recorded September 12, 1950.

There is no question as to the foregoing facts nor as to the fact that the Grafelmans proceeded within the following year to build a boat slip (sometimes called a dock in the testimony but being an enclosed indentation in the shore line) and began the construction of a house on Lot 85. The boat slip was located on the south side of Lot 85 and was placed near the south line of that lot which is the disputed boundary here involved. However, on September 1, 1951, the title was transferred by Mr. Grafelman to Grace

Sellman, Reuben Sellman, George Sellman, Marjorie Sellman and Marilyn Snyder (hereafter referred to as "Sellman" for simplicity). (These people acquired Mrs. Grafelman's interest by a separate deed.) The deed from Mr. Grafelman was for some reason marked "Transfer not necessary Mch. 13, 1952" by the auditor of Logan County but was not recorded until October 17, 1960. The Sellmans completed the house and utilized the premises over the following years.

On May 10, 1956, the Leathermans sold and transferred Lot 86 to Charles L. and Dorothy E. Schaaf. The deed was recorded May 10, 1956.

Although the record title is therefore somewhat confused at times by the delays in recording, it is apparent from the testimony that possession was actually transferred in each case at the date on the deed or shortly thereafter.

At some point in the ownership of the Sellmans and the Schaafs, a fence was erected by Schaaf essentially continuing the south line of the boat slip, a line then assumed to be the dividing boundary between the two lots.

Subsequently, and apparently due to a survey involving property to the south, Schaafs had the boundary line between Lots 85 and 86 surveyed and the surveyor indicated a new line which ran down the middle of the boat slip. Schaaf moved his fence and placed a post on the new line in the interior of the boat slip. This led to the present law suit.

Sellman, on October 19, 1960, filed a petition against the Schaafs, praying for a temporary and permanent injunction enjoining Schaafs from interfering with their possession. To this, the defendant Schaafs filed an answer and cross-petition setting forth four causes of action:

1. In ejectment for recovery of real estate.
2. For damages for wrongful us of real estate.
3. For prosective damage for continued use.
4. To quiet title, and also for a mandatory injunction to require plaintiffs to remove the boat slip from their premises.

Thereafter, the plaintiffs filed an amended petition joining as defendants their predecessors in title, the Graf-

elmans and the original dedicators, John P. Schooley and Harry E. Johnson; also joined were Mrs. Leatherman (Mr. Leatherman being deceased), and a Mr. Cary owning Lots 87 and 88 to the south of Lot 86. They then prayed for a temporary and permanent injunction against Schaafs from interfering with the plaintiff Sellmans' use of the boat dock, a mandatory injunction to remove the steel fence erected by defendant Schaafs, for a determination of the true boundary line of the premises (presumably a declaratory judgment or a prayer to quiet title), an injunction against Cary, Schooley or Johnson asserting title to the premises and, in the alternative, if the court found in favor of Schaafs' claims as to the boundary, damages against Grafelman and Johnson. Subsequently, Cary and Schooley were dismissed as defendants by the trial court and the issues were joined. Trial was had and the ultimate judgment of the court in effect denied plaintiffs' petition for injunction, determined the boundary to be as Schaafs claimed, granted Schaafs' prayer for a mandatory injunction requiring Sellmans to remove the boat slip, granted to Schaafs damages of $450 from the Sellmans for wrongful use of part of Schaafs' land and further awarded Sellman a judgment of $450 against Grafelman, one of his predecessors in title. No relief was awarded against Mrs. Leatherman, and Mr. Grafelman is concerned only with certain alternative relief.

Appeal on law and fact is taken to this court from that judgment. (Note: appeal was previously taken herein but the case was returned to the trial court for lack of a final order. See *Sellman* v. *Schaaf*, 17 Ohio App. 2d 69.)

The initial relief here requested on both sides is a mandatory injunction; on the plaintiffs' side to remove the fence and steel post; and on the defendants' side to remove the alleged encroachment of the boat slip or dock. However, it would appear that the primary, paramount and basic relief requested, expressly or implied, by both parties is the quieting of title to real estate, and to do this it is necessary to determine where the common boundary line between Lot 85 and Lot 86 is located. The other relief is ancillary, supplementary, or alternative to this basic issue.

In R. C. 5303.01, it is provided that "an action may

be brought by a person in possession of real property * * * against any person who claims an interest therein adverse to him, for the purpose of determining such adverse interest.''

The facts here involved show that each party claims and to some degree is in possession of the disputed area. Here also, there are mutual adverse claims of title, and each, as to the other, makes such claims. An action at law for trespass (predicated upon possession) or ejectment (predicated on being out of possession) would be of doubtful value and in any event could result in continuing repeated actions and in a multiplicity of suits; it would therefore appear that the remedy at law would be inadequate and that the exercise of equity powers to quiet title would be proper.

See *McBride* v. *Murphy*, 111 Ohio St. 443; *Ellithorpe* v. *Buck*, 17 Ohio St. 72; *Culver* v. *Rodgers*, 33 Ohio St. 537. *Bailey* v. *Hughes*, 35 Ohio St. 597. *Willey* v. *Lewis*, 11 Dec. Rep. 607.

Proceeding then upon the conclusion this is basically an action to quiet title by the determination of a boundary, we turn to a more detailed factual analysis. The facts indicate that both the lots are located on the shore of the island and are essentially wedge shaped, although Lot 86 approaches in form a parallelogram. Lot 85, wedge shaped, has its shortest dimension along the lake front to the east. The west boundary, which is larger, extends along Seminole Shore Drive. On the south it has a common border with Lot 86, the boundary line in issue. Lot 86 also on the east fronts on the lake shore and on the west on a circular drive which comes off from Seminole Shore Drive.

The narrow question presented concerns the ownership of a triangular sliver of land between the two lots, the boat slip on Lot 85 being partly in this area. There is no question as to the southwest corner of Lot 85 and the northwest corner of Lot 86 which are identical. However, the plaintiffs and defendants claim differing location for the southeast corner of Lot 85 which should be identical with the northeast corner of Lot 86. The plaintiff contends this corner lies to the south a short distance from the boat dock. The defendants, Schaafs, place the corner some distance

north in the middle of the boat dock. To determine the ownership of this pie shaped wedge it is necessary to analyze the law pertaining to descriptions, boundaries and surveys to place in proper perspective the evidence here presented.

Each party received a deed which refers to a recorded plat or survey and there is no question but that the measurements, courses, and monuments shown on the recorded plat are incorporated in each deed by reference. The descriptions therefore embody, just as would a metes and bounds description, the monuments, courses and distances set forth in the plat to describe the actual land owned by each party. However, this description and this plat is a symbolic representation of something which has been physically marked out on the surface of the earth. The actual physical markings and location by monument or otherwise is the primary thing. It locates the land. The map or plat is secondary to this purporting to symbolically represent that which has been physically located.

A reference to R. C. 711.01 makes this clear. It states in part that:

"Any person may lay out a village, or subdivision or addition to a municipal corporation, by causing the territory to be surveyed, and by having a plat of it made by a competent surveyor."

Thus, the subdivision is first done by the survey of the premises, establishing monuments, corner posts, etc., so that a physical or semi-physical dividing of the land with the attendant markings takes place. Then a "plat is made." The symbolic representation of what was done on the premises becomes the recorded documentation of the action taken and provision is made for the dedication and acceptance of public streets and ways. Today there are more regulations than existed at the time the plat here involved was made, but the essential sequence of events remains the same.

This being the case, the further question then arises: what is the situation where the actual location of a corner by a surveyor in setting up a subdivision differs from the description or plat?

Referring to the recorded plat in the instant case, we find that the eastern end of the dividing boundary line between Lots 85 and 86 was located by a stake placed in a

measurement line in the original survey. It is explicitly stated "all lots have been staked." The location of the stake is shown by a black dot which is coded to indicate an iron pipe. Whether the pipe was so placed is doubtful according to the testimony but the conclusion is inherent in the plat and from the evidence that a stake was placed at this location, and a stake may be a monument. It necessarily becomes one here and constitutes the method for locating the boundary line.

2 McDermott, Ohio Real Property 128, states in part: "A reference in a deed to a plat incorporates the plat and constitutes an adoption of the survey as a part of the description. A conveyance by lot number assigned by a plat incorporates the plat as part of the description. The survey as actually made controls the representation of it on the plat."

In the question here stated, if the original stake were still in its original situs and this were established by competent evidence, then there would perhaps be a conflict between the courses and distances noted on the plat and the stake, an artificial monument set up by the original surveyor. In such event which should determine the boundary?

Although much discussion is set forth in the briefs dealing with the priority of calls and whether monuments govern courses and distances, it would appear the actual question is not initially this order of precedence but what was actually done by the original surveyor. As set forth by McDermott and as is inherent in the relationship between the survey on the land and the plat, the survey as actually made on the land must govern. It is Lot 85 as originally surveyed which we are trying to find, and by this we mean its original location on the ground. If this can in fact be found, it is that land that was sold, not the symbolic plat, and it is the land as marked out by the original surveyor that constitutes Lot 85; and likewise with Lot 86.

This line of reasoning is buttressed by the concept governing all resurveys. When an original survey has been made, it is not the plat or the metes and bounds description that is primary. The primary function of the second surveyor is to find first where the boundaries were established

by the first surveyor. Only where this becomes impossible of accomplishment does the second survey turn to the courses, distances, and still-existent monuments to determine the boundaries. The essential rule governing the resurvey is to follow the steps of the first surveyor.

McDermott, *supra*, at 139, paragraph 3-26A states:

"Conveyances are presumed to be made according to a prior actual survey. It is said that the primary purpose of construction is to follow the footsteps of the surveyor on the ground."

2 Proof of Facts 651, Boundaries, states:

"A survey is the locating and marking on the ground of the land described in a grant. Once a tract has been located by survey, and its boundaries have been marked, those boundaries cannot be altered by a subsequent survey. In making a resurvey, the duty of the surveyor is merely to locate the monuments placed by the original surveyor, or, where such monuments no longer exist, the places where they originally stood."

12 American Jurisprudence 2d 594, Boundaries, Section 55, reads as follows.

"All lands are supposed to be actually surveyed, and the intention of the grant is to convey the land according to the actual survey. It is therefore said that the real purpose of a boundary inquiry is to follow the steps of the surveyor on the ground, and all calls will be construed with this in mind."

In 11 Corpus Juris Secundum 540, Boundaries, Section 3, it is said:

"It has been declared that all the rules of law adopted for guidance in locating boundary lines have been to the end that the steps of the surveyor who originally projected the lines on the ground may be retraced as nearly as possible; further, that in determining the location of a survey, the fundamental principle is that it is to be located where the surveyor ran it. Any call, it has been said, may be disregarded, in order to ascertain the footsteps of the surveyor in establishing the boundary of the tract attempted to be marked on the land; and the conditions and circumstances surrounding the location should be taken into consideration to determine the surveyor's intent."

In Clark, Surveying and Boundaries (2d Ed. 1939), it is said at page 727, Section 665:

"The original survey must govern if it can be retraced. It must not be disregarded. So, too, the places where the corners were located, right or wrong, govern, if they can be found. In that case a hedge planted on the line established by original survey stakes was better evidence of the true line than that shown by a recent survey. In making a resurvey it is the surveyor's duty to relocate the original lines and corners at the places actually established and not to run independent new lines, even though the original lines were full of errors."

In 6 Thompson, Real Property, 594, Description and Boundaries, Section 3047 (1962 replacement), the following is stated.

"The line actually run is the true boundary, provided the essential survey can be found and identified as the one called for, and prevails over maps, plats, and field notes. * * * The lines marked on the ground constitute the actual survey and where those lines are located is a matter to be determined by the jury from all the evidence. If the stakes and monuments set at the corners of the parcel in making the survey have disappeared, it is competent to show their location by parol evidence."

At page 599, Section 3049, it is further said that:

"Marked corners are conclusive and will control over courses and distances. Although stakes are monuments liable to be displaced or removed, they control so long as it is certain that they mark the corners of the original survey."

In Ohio, in an 1834 case, the Supreme Court in essence announced the basic principle here involved.

In *Avery's Lessee* v. *Baum's Heirs*, Wright, 576, paragraph 3 of the syllabus reads as follows:

"In locating a deed upon land, the rule is—first, to find the original lines as actually run;— second, to run lines from acknowledged corners or calls,—third, lines run according to the courses and distances called for in the deed."

Also, we may note that the essential procedures established by statute for the survey and establishments of corners by the county engineer (see R. C. 315.28 et seq.) are predicated upon the principle of establishing, if at all possi-

ble, from parol and other evidence the situs of corners as originally situate.

We therefore conclude that the original survey by Toy in 1944 made on the land established the monuments and lines by which the boundaries of the two lots here involved were delineated. If the original monuments can be established by parol or other evidence, they may be relocated upon the land irrespective of any deviation in courses and distances from other monuments as shown on the plat. The monuments the original surveyor established on the land govern and establish the line. Here, only one monument is in question and is determinative of the line. It is the stake placed by Toy at the time of the original survey and constituted the intersection of a north-south line (a measurement or traverse line) near the lake front with the east-west line between Lots 85 and 86. The plat designates that such a monument, artificial in character but nevertheless a monument, was placed by Toy, the original surveyor. This court is in essence doing that which a second surveyor would do. It is attempting to follow Toy's footsteps and establish what he actually did on the land itself. If this can be established, it takes priority; if not, then we must turn to the use of the plat and courses and distances from other monuments actually located.

Essentially, the evidence in this case is predicated upon each of the two routes to the establishment of a boundary line. The plaintiffs, Sellmans, contend that, although the stake is gone, its actual location may, by evidence, be established sufficiently to define the line. The defendants, Schaafs, contend this monument is utterly lost and resort must be had to the plat, to courses and distances and other monuments from which their surveyor relocates the point and hence the line. As we have seen, the establishment of the position of the original stake as placed in November, 1944, by Toy, the surveyor, takes precedence. If the evidence can establish this location, then the steps of the original surveyor having been followed, the case is ended. The original position so established governs.

It will be noted the evidence itself, as presented by the two sides, basically does not contradict, but travels or points in these different directions. The defendants, Schaafs, did

not testify as to the position or identity of any original stake but predicated their claim on a new or resurvey from certain surviving monuments. Mrs. Leatherman, called by Schaafs, testified first that she and her husband were shown corners of the lot and stakes on the ground when they bought and that a Mr. Miller built the boat dock according to the stake, and that this stake was on "his side" of the boat dock. Later she states that she really can't remember, thus ending up on both sides of the issue. The basic witness for the Schaafs is Lewis, the surveyor, who in 1959 surveyed the line for Schaafs. (In passing we should note that in spite of R. C. 315.20, it has long been held that the testimony of surveyors as expert witnesses may properly be received by the court. *Zipf* v. *Dalgarn*, 114 Ohio St. 291; *Glass* v. *Dryden*, 18 Ohio St. 2d 149; *Kramp* v. *Toledo Edison*, 114 Ohio App. 9.) He says only that he found no stake or monument and proceeded to establish the line by reference to other discovered stakes in somewhat distant lots.

On the other hand, the testimony of the Sellmans does not in effect dispute the accuracy of this survey. These witnesses all testify as to the location of what they contend was the original monument placed by the original surveyor, Toy, and dispute the necessity for establishing the line by reference to any other monuments. In passing, we should note that a stake is an artificial monument, and we here so treat it. In 12 American Jurisprudence 2d 608, Boundaries, Section 71, it is said:

"A stake when once placed, however, fixes the corner as conclusively as if it were marked by a natural object or a more permanent monument. Owing to the fact that it may be removed or obliterated, its location is frequently more difficult of proof, but if proved, it fixes the corner with the same certainty as where the mark is a permanent object.

"Although monuments set at the time of an original survey on the ground and named or referred to in the plat are the best evidence of the true line, if there are none such, then stakes actually set by the surveyor to indicate corners of lots or blocks or the lines of streets, at the time or soon thereafter, are the next best evidence."

In other words, the two theories of the case never col-

lide. If the proof establishes the position of the corner (actually a stake placed to mark the intersection of a traverse line and the line between Lots 86 and 85) with reasonable accuracy and this is, in fact, the position of the stake as placed by Toy, then under the law as we have analyzed it, this must govern even if Toy was in error in the original placement. On the other hand, if this location is not established, then the original monument is lost completely. Then, the resurvey as made by Lewis based upon courses and distances shown on the plat as run from found and established monuments must govern and there is no expert testimony contradicting him. The issue then boils down to the evidence of the location of the stake. If this is established by the appropriate degree of proof, then the line must be so established. If it is not established by the appropriate degree of proof, the survey by Lewis replacing the lines by the next best method must govern. In a word: the issue depends upon the case made by the plaintiffs, Sellmans, for if their proof fails, the Lewis survey must prevail.

The degree of proof in a quiet title action is not concisely stated in Ohio cases. However, in 74 Corpus Juris Secundum 124, Quieting Title, Section 80, the following appears.

"The general rules as to the weight and sufficiency of evidence are applicable in determining the sufficiency of the evidence in proceedings to quiet title or remove clouds thereon, and, in order for plaintiff to recover, it is incumbent on him to make out his case by the preponderance of the evidence."

As indicated in prior paragraphs, we consider the basic issue here to be a mutual action to quiet title and the balance of the relief requested by both parties is ancillary and subsidiary to this question, and this basic issue must therefore be governed by the preponderance of the evidence.

Do the Sellmans and their witness establish the location of the original traverse point as marked by a stake set by the original surveyor, Toy, and do they establish this by a preponderance of the evidence?

Without analyzing in detail the testimony of the var-

ious plaintiffs who are the owners in common of Lot 85, and of the others called by them we arrive at certain basic conclusions of fact.

1. The original surveyor, Toy, did mark the various corners of the lots including the intersection of the traverse line and the common boundary of Lots 85 and 86 by wooden stakes in 1944.

2. When the Sellmans purchased Lot 85 in 1951, there was a wooden stake about a foot or foot and one-half south of the southeast corner of the boat slip. The position of this stake may be located within practical limits necessary to establish a common boundary between Lots 85 and 86, since there is no issue as to the location of the west terminus of the line.

3. There is now no stake at this position at the corner of the boat slip.

In the survey of federal lands, many special rules appear to govern, but one distinction made in these rules appears to be reasonable and applicable to the present situation. This is the distinction made between an "obliterated" corner and a "lost" corner.

In 11 Corpus Juris Secundum 554, Boundaries, Section 13, it is said:

"In the discussion of the relocation or reestablishment of government corners, a distinction is frequently drawn between 'obliterated' corners and 'lost' corners, the importance being that in the case of an obliterated corner the investigation is directed toward the determination of its original location while in the case of a lost corner the question is one of relocating the corner by a new survey. For the purpose of this distinction an obliterated corner may be defined as one of which no visible evidence remains of the work of the original surveyor in establishing it but of which the location may be shown by competent evidence. A lost corner is one which cannot be replaced by reference to any existing date or sources of information * * * ."

Thus, the stake of 1951 is not lost. Its position can be shown by competent testimony which is undisputed and which is reasonably the same from a substantial number of witnesses. Even Mrs. Leatherman, called by defendants, Schaafs, in her first recollection, so located this stake, al-

though in cross-examination her answers are vague and less definite. However, the question narrows to the problem of the identity of the stake of 1951 and the stake of 1944. If the stakes are identical, then the monument placed by the original surveyor, Toy, is not lost, simply obliterated, and its position is established. If the proof fails as to identity, the monument is lost and the point, and thus the line, must be considered lost and relocated by the Lewis survey.

It is our conclusion that the identity is established by a preponderance of the evidence and that the stake of 1951 is the same stake placed by the original surveyor, Toy.

1. Although there is a period of six years between the sale of the lot to Grafelman by Johnson in 1950 and the placing of the stake by Toy in 1944, there is no evidence the original stake was moved or replaced during that period. There was some testimony by Lewis that dredging operations had occurred near other lots but at no time was it indicated nor was it testified to that Lots 85 or 86 were specifically effected. Johnson, the then owner, establishes the identity of these stakes of 1944 and 1950.

2. The identity of the 1951 stake with the stake pointed out by Johnson to Grafelman in 1950 is established by Grafelman.

3. The actions of Toy, the surveyor, in 1951, at the Labor Day Conference on the site are consistent only with the conclusion that he recognized the stake as his and as located by him. Toy, it is testified, explicitly identified the stakes then on the premises as his.

4. The testimony indicates that measurements made in 1951 were exactly as shown on the plat as to the distance between the two stakes on the traverse line—a highly unlikely result if either of the stakes were different.

Although this testimony is made by interested parties, they are parties in a position to observe; their testimony is uncontradicted and there is substantial mutual corroboration.

Concluding, then, that the stake of 1944 is the stake of 1950, and that the stake of 1950 is the stake of 1951, we find that the stake marking the intersection of the traverse line with the common boundary of Lots 85 and 86 as placed

by Toy, the original surveyor, is not lost, but, being merely an obliterated monument, its position for all practical purpose is established and must govern the location of the boundary.

The witnesses differ slightly as to their distance from the boat dock wall, varying from "just south [of] the boat slip" to one and one-half feet south. The plat made by Lewis and marked Exhibit D locates this line by reference to the fence that had been in place for many years. Extending this fence line establishes the boundary line at .54 feet from the edge of the boat slip roof and for practical purposes represents the boundary as originally surveyed by Toy.

This, then, we determine to be the line between Lots 85 and 86 and title to the disputed land north of the line as so located is quieted in the plaintiffs, Sellmans, et al. Title to the disputed land south of the line as so located is quieted in the defendants, Schaafs.

Turning to the prayer of the petition and cross-petition supplemental and ancillary relief prayed for:

1. The defendants Schaafs' prayer for recovery of the triangular parcel as established by the survey of Lewis is denied.

2. The defendants Schaafs' prayer for damages is denied.

3. The defendants Schaafs' title is quieted as above set forth.

4. The defendants Schaafs' prayer for a mandatory injunction is denied.

5. The plaintiffs Sellmans' prayer for an injunction is granted to the extent that defendants Schaafs are enjoined from interfering with the use by Sellmans of the land north of the boundary so established and are directed to remove the steel fence from the Sellman premises as herein determined and are further directed to remove the steel pipe placed by them or caused to be placed by them in the boat slip area of Lot 85.

6. The plaintiffs' prayer that the true boundary line be determined is granted as aforesaid.

7. The plaintiffs' prayer for alternative relief against their predecessors in title is denied.

Costs are assessed against defendants Schaafs, and the cause is remanded to the Court of Common Pleas for execution and enforcement of the judgment.

*Judgment accordingly.*

YOUNGER, P. J., and GUERNSEY, J., concur.