IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 18, 2013 Session

## MILTON G. HUMBERD, JR. v. WANDA N. FITZSIMMONS

**Appeal from the Chancery Court for Bradley County**
**No. 08-301      Jerri S. Bryant, Chancellor**

_____

**No. E2013-00246-COA-R3-CV-FILED-NOVEMBER 26, 2013**

_____

This is a boundary line dispute involving the placement of a new fence and the location of a corner. The suit involves a small triangular piece of property approximately two-tenths of an acre out of two adjoining 40-acre tracts owned by the parties. The value of the land in dispute is approximately $200. The trial court found the boundary line runs along a tree line essentially synonymous with the agreed upon old fence line as indicated on the Lawson survey. The court then located the corner as a car axle in the southwest corner of the plaintiff and the southeast corner of the defendant. The plaintiff appeals. We affirm the findings of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Ginger Wilson Buchanan, Cleveland, Tennessee, for the appellant, Milton G. Humberd, Jr.

Barrett T. Painter, Cleveland, Tennessee, for the appellee, Wanda N. Fitzsimmons.

**OPINION**

**I. BACKGROUND**

The family of Milton G. Humberd, Jr. ("Plaintiff")[1] obtained his property in 1940.

_____

[1]Humberd owned his property with his wife, Susan Petty Humberd, at the time this dispute arose.
(continued...)

The land was acquired from J.J. Fitzsimmons, the father-in-law of Wanda N. Fitzsimmons ("Defendant").[2] The Fitzsimmons family obtained their parcel in 1957. These properties do not go back to the same chain of title. The placement of the original fence ("the Old Fence") between these properties was initially agreed upon by family members more than fifty years ago and was the agreed upon boundary line. The parties in this action continued to recognize the Old Fence as the boundary.

In 1978, the Fitzsimmons family was involved in a dispute with another adjoining landowner – the Jordans – regarding a right-of-way that ran across Defendant's property parallel to the Old Fence. At that time, Neal Sanders was hired to prepare a survey. His survey shows the location of the Old Fence and indicates the disputed southern corner is marked by a fence corner. It also shows the call and distance from the northern corner to the southern corner as South 27 degrees 46 West 1,319.6. It appears Mr. Sanders then prepared a drawing that identified the disputed corner as an "iron pin near fence post." The drawing has a line pointing in the direction of the disputed corner and 'axle' written beside the line. The drawing shows the call and distance as North 27 degrees 46 minutes East 1,319.6 – the reverse of the call and distance denoted on the survey. Mr. Sanders did not stamp or sign the drawing. As a result of the right-of-way dispute, the record reveals additional fencing was installed to set out the 16 foot right-of-way.

The Fitzsimmons family eventually acquired the Jordan property from a local bank after a foreclosure proceeding.[3] The right-of-way ceased being used at that point. In 2005, Defendant's husband, Hoyt Fitzsimmons, hired Larry Layne of Cleveland Surveying Company ("CSC") to survey the former Jordan property and his own tract in order to partition off a parcel for sale. Mr. Layne testified that he identified and found several iron pins and monuments, looked at adjoining property owners' deeds, and reviewed the survey, drawing, and notes of Mr. Sanders. As to the northern corner between the current parties, he located the corner at a post and drove a nail into the center of it. Mr. Layne related that he found the car axle identified by Mr. Sanders and concluded it was the southern corner. He noted that Mr. Sanders's notation regarding the car axle was "not unusual to see" and that

---

[1](...continued)

Prior to the filing of the action, Mrs. Humberd quit claimed her interest in the property to her husband. Thus, at the time the action was filed, the property was solely in his name.

[2]Fitzsimmons previously owned her property with her husband, Hoyt Fitzsimmons, now deceased. Prior to the action being filed by Plaintiff, Mr. Fitzsimmons had quit claimed his interest in the property to his wife.

[3]The record reveals the Jordan and Fitzsimmons tracts previously had been part of one parcel originally totaling 130 acres.

it was "clear" to him that Mr. Sanders was "saying that car axle is the corner."

By 2006 the Old Fence was in disrepair, and Defendant's cattle were crossing over onto Plaintiff's land. Hoyt Fitzsimmons hired Junior Keith and Philip Whitted to build a new boundary fence. According to the deposition testimony of Hoyt Fitzsimmons, he asked Plaintiff if he wanted to establish the corner in dispute and Plaintiff informed him that he did not have time. Mr. Fitzsimmons related that he told Plaintiff, "I'll put it up there where it was." Mr. Keith and Mr. Whitted thereafter began erecting new posts six inches to one foot near the Old Fence on what they believed was the Fitzsimmons side of the property. The next day, however, the posts had been cut down. John Humberd, Plaintiff's son, admitted responsibility for the act. The Humberd family asserted that Hoyt Fitzsimmons had torn down a portion of the Old Fence and built a new fence without any advance notice to, or the consent of, Plaintiff.[4]

Because of the dispute concerning the placement of the new fence, CSC was hired again by Mr. Fitzsimmons to mark the boundary line. According to Defendant, the new fence eventually was constructed according to CSC's survey that utilized the axle as the southern corner.

Plaintiff opined that the original southern corner had been a fence post, not the axle, and that the new fence encroached upon his land and took in up to three feet of his property in some areas. In October 2007, after the new fence was erected, Plaintiff hired Patrick Lawson of Southeast Tennessee Land Surveying, a licensed surveyor, to prepare a survey showing the Old Fence in relation to the new fence. Mr. Lawson testified at the eventual trial that he did not refer to any other surveys prior to beginning his work. He used the southern corner claimed and shown to him by Plaintiff to establish the boundary line. Mr. Lawson noted that he found the metal stake but could not identify it as a car axle. He admitted that he could not determine if the post hole Plaintiff pointed out to him as the location of the original corner was old or new. He depicted in a drawing remnants of the Old Fence he found both in remaining trees and on the ground. Further, Mr. Lawson purportedly found remnants of fence in the hole Plaintiff claimed as the original corner.

In locating the line, Mr. Lawson testified that he identified a northern corner between the parties marked with a nail driven into the top of a fencepost. He related that there was no call in any of the deeds for that but it appeared to be the accepted corner. Mr. Lawson acknowledged on cross that if the northern corner has moved since 1979, the distances and bearings indicated in the original survey would be thrown off. From the northern corner, he ran a line to the fence post hole identified by Plaintiff as the southern corner. Comparing his

---

[4]The record reveals the relationship between the parties was somewhat strained.

survey with Mr. Sanders's survey, Mr. Lawson found the distance of the line he measured from the northern corner to the southern corner to be within one-tenth of a foot of Mr. Sanders's measurements (Mr. Lawson measured 1,319.5 and Mr. Sanders measured 1,319.6.). Mr. Lawson observed that CSC measured the distance from the northern corner to the axle in the southern corner as 1,317.77 feet (Mr. Layne identified the distance as 1,317.9 feet) – a difference with Mr. Sanders's survey of approximately 1.8 feet. He found the bearings between Mr. Sanders's survey and that of CSC to be off by a minute and one-half. Mr. Lawson's opinion was that the bearing difference is not as significant as the difference in distance. He noted the difference between his corner and CSC's corner is 3.5 feet.

Upon Plaintiff filing this lawsuit in October 2008, Defendant again hired CSC. Mr. Layne re-surveyed the property, using his prior surveys and Mr. Sanders's survey work to identify the corners he had previously located. Using the agreed upon northern point, he shot a line to the car axle. Mr. Layne testified the line he shot was the same as the line shown in the drawing by Mr. Sanders as well as the same line shown in Mr. Sanders's survey. Mr. Layne opined that the axle he found in 2005, 2007, and 2010 is located at the same place identified by Mr. Sanders.

The trial began April 8, 2010, then resumed over nine months later on January 26, 2011.

Clifford Earle Murphy testified that he is familiar with the property because he previously cut hay for Hoyt Fitzsimmons, retrieved Defendant's cows from Plaintiff's field, and often repaired the Old Fence. According to Mr. Murphy, when cutting hay, he traveled the 16 foot right-of-way that abuts the disputed southern corner. One piece of equipment he used was a ten-foot-wide hay conditioner. When he maneuvered the southern corner with that machine, the corners were close and only allowed approximately six inches on each side. He testified that the Old Fence "was located in the trees . . . . It was nailed to the trees. . . . Page wire is still nailed there." Mr. Murphy personally observed the new fence and opined that the southern corner is now wider than when the Old Fence was in place. Mr. Murphy observed that the new fence was "moved over on the Humberd side a good three f[ee]t." He noted on cross that there had been two fences – lining both sides of the right-of-way – with one being the boundary line. He testified that "the old fence was nailed to trees" and "[t]he new fence is moved over and nailed to posts." He acknowledged that he last traveled the right-of-way about 12 years ago. When recalled to the stand by Defendant to look at pictures of the right-of-way fence that contradicted his prior testimony, Mr. Murphy stated, "I ain't going to say now. I don't remember."

John Humberd, Plaintiff's son, acknowledged that Hoyt Fitzsimmons told him that he

needed to put a new fence in and asked him to locate the southern corner. Mr. Humberd has an engineering degree from Tennessee Tech and had taken surveying classes. He enlisted the help of his friend, John Edwards, who also has some background in surveying. They worked together to establish a parallel line from the fence by finding a spot located in the line and stepping out the necessary amount of space to be able to shoot the line to the end. He used this process to establish a point for the southern corner and marked the spot with a metal post. According to Mr. Humberd, when the new fence was installed, it was too far over on Plaintiff's side of the line.

John Edwards's testimony reiterated the process he and John Humberd used in locating the southern corner. He detailed locating remnants of the Old Fence in the tree line as well as locating an "old wood post" in the disputed line. Mr. Edwards testified that he and Mr. Humberd used the old wood post to create the parallel line. He noted the place where they marked the corner appeared to have been an old post hole. Mr. Edwards admitted that they did not go up to the agreed northern corner and run the line back.

Ray Cox, a friend of Plaintiff's who also had worked on the Fitzsimmons farm, testified that he had worked previously at the Jordan poultry farm located beyond the right-of-way that abutted the disputed corner. During that period of time, Mr. Cox used the right-of-way once or twice a week for about ten years. Regarding the right-of-way, he observed: "It run between the fence rows. They had two fences going down through there. Had a fence on the right and a fence on the left. And there was a road probably twelve foot wide that run from [Jordan]'s place down through Mr. Fitzsimmons's place back out onto Valley View Road over there. . . ." Mr. Cox related that during the time he worked for the Jordans, he drove a 2002 Chevrolet Dually as well as a chicken housekeeper through the right-of-way. He described the equipment as "about probably ten foot wide, outside wheels to outside wheels." He noted that it was narrow at the disputed corner.

According to Mr. Cox, Hoyt Fitzsimmons originally hired him to push the Old Fence out with a dozer. Mr. Cox began the work, but stopped after taking down approximately 100 feet of the fence. Opining that the Old Fence was "pretty decent," he acknowledged "it wouldn't keep cattle in but . . . it would be ideal for a boundary marker." Mr. Cox testified that he personally observed the location of the new fence and believes the location is "two and a half or three foot" over onto Humberd's property. He opined the southern corner was "the big corner post hole." Hoyt Fitzsimmons related in his deposition, however, that the work Mr. Cox did was on the right-of-way fence – not the Old Fence.

Plaintiff testified that he has lived on the property for his entire life and has actively farmed the property since the 1960s. According to Plaintiff, the northern corner was agreed upon by the parties after Plaintiff replaced the original fence post. CSC later verified the

northern corner and marked it by driving a nail on top of the post. Plaintiff contends the southern corner was a fence post connected to the Old Fence. He acknowledged that over 30 years ago a car axle was in the ground near the corner he claims. Plaintiff argues the axle described by Defendant is off by "a couple or 3 feet . . . ."

Plaintiff testified regarding the distances between the Old Fence and the new fence. The measurements ranged from 13 inches to 24.5 inches. According to Plaintiff, the measurements were taken from points where remnants of the Old Fence were located in trees or along the ground over to the new fence.

Jim Fitzsimmons, Defendant's son, discussed visiting the property once "every week or two" in the 1960s and 1970s to see his grandfather. Once his parents moved onto the property, Mr. Fitzsimmons stated that he visited more often and helped work on the farm. He acknowledged that he grew up in Chattanooga and did not start living on the property until 2002. He recalled the dispute with the Jordans and saw the axle in place after Mr. Sanders's survey was done. He testified that the right-of-way fence was never tied to the southern corner. Mr. Fitzsimmons related that the right-of-way fences had been used to keep the cattle in and were taken down about the time the easement was abandoned. Thereafter, the boundary fence was used to maintain the cattle. He stated that it had been the intention of the Fitzsimmons family to place the new fence about a foot over from the survey stakes toward their property. He expressed a familiarity with the Old Fence and recalled that it was tied to trees and fence posts. Mr. Fitzsimmons acknowledged that he did not perform any of the maintenance on the Old Fence.

Phillip Whitted testified that Hoyt Fitzsimmons hired him to build the new fence. He was unable to identify with specificity what part of the Old Fence he had removed, but he recalled that other parts had been torn down prior to his involvement. He did not remember taking any fence line out of any trees or cutting down anything big. He stated that he did not recall "taking out any wood posts, but [he] remember[ed] some steel posts." Mr. Whitted noted that brush and debris had grown up around the Old Fence on both sides.

In constructing the new fence, Mr. Whitted used the car axle as the beginning point and recalled it being "about a foot from the fence over to the right." He recalled Plaintiff getting down and digging out an area that Plaintiff believed represented the true corner. According to Mr. Whitted, Plaintiff stated "something about a hole being there." Mr. Whitted stated that he did not locate a hole. When he commenced building the new fence, he observed that there were no survey stakes to guide his path. When the dispute arose, CSC returned to the property and marked what it identified as the boundary line with a stob. He opined that the new fence was constructed a foot over on Defendant.

Roy Montgomery Climer, a survey technician for CSC, testified that he has never been to the property and his work is based entirely on the work others completed prior to his involvement and information brought to him from the field. The information provided to him was entered into a computer program. Mr. Climer noted that after CSC was made aware of the boundary dispute, he reviewed the work and compared it to Mr. Sanders's work. He testified additional field work was performed limited to the 2005 survey previously prepared by CSC and the northern portion of the property. He recalled that Mr. Sanders's work fit reasonably well into CSC's 2005 survey. As for the difference in the work produced by CSC and Mr. Sanders, Mr. Climer attributed the differences to the equipment as well as his belief that "two men won't measure the same thing." Mr. Climer observed the line shot by CSC is within a foot of the line shot by Mr. Sanders.

The trial court found the parties' predecessors in title agreed to the Old Fence line being the boundary for the properties. Additionally, it found the parties in the instant case considered the Old Fence to be the boundary line. The trial court also determined the parties had agreed that an iron pin located in a fence post in the northeast corner of Defendant's land and the northwest corner of Plaintiff's land was the northern corner. In that the court did not find any real dispute between the parties, it concluded Mr. Lawson's survey represented the boundary line.

In regard to the corner in dispute, the trial court observed as follows:

Mr. Humberd's surveyor shot this line where the old parts in the trees were marked and he used where Humberd told him the south endpoint was, which was a hole in the ground where Mr. Humberd claims there was a locust fencepost and some fence wire. It is not usual to put fence wire in a hole and the Court has looked at that testimony and taken the testimony of Mr. Lawson, who did see the hole as pointed out by Mr. Humberd, and compared that with the testimony of the other surveying company in this case, Cleveland Surveying, and the Court then also carefully compared the drawings in this case that were made by Cleveland Surveying, Mr. Sanders, Mr. Lawson.

The bearings of Layne were the same as the bearing of Sanders. The bearings of Layne also were the same as Sanders on other lines of Fitzsimmons, not just the eastern boundary line of Fitzsimmons. Layne, as far as a survey, did make more connections, in other words, used more points to delineate and find boundary lines to double-check the accuracy of his line; and, while his line gives him a different distance than Lawson, it gives him three additional points as an anchor to a parcel of property that all were consistent with the Sanders survey in 1978.

-7-

* * *

So since it's [Plaintiff]'s job to prove where the southern property corner is, he has failed to prove that it is anywhere other than the axle.

Based upon its findings of facts, the trial court ordered Defendant to move the new fence to the line indicated by Plaintiff's surveyor where fence remnants were found in trees. The trial court entered the following order:

> ORDERED the attached transcript of the Court's ruling shall be the findings of the Court and is incorporated into this Order by reference as if restated verbatim. It is, further
>
> ORDERED that the Southwest corner of Humberd and the Southeast of Fitzsimmons shall be set at the car axle. The beginning point of the disputed boundary line of Humberd's Western line and Fitzsimmons'[s] Eastern line shall begin at the end of the old fence which is more particularly shown on the surveys of Patrick Lawson and Cleveland Surveying . . . . The Fitzsimmons[es], at their expense, including fence relocation and survey expense, shall restore the fence to the former location with the trees as noted on the Lawson survey with the fence ending at the car axle which will be the Southeast corner of Fitzsimmons and Southwest corner of Humberd. . . .

Plaintiff thereafter filed this timely appeal.

## II. ISSUES

Plaintiff raised the following issues in this appeal, which we restate:

1. Whether the trial court correctly found the southern terminus of the parties' boundary line was at the car axle located at the Defendant's southeast corner and Plaintiff's southwest corner.

2. Whether the trial court correctly held that the new fence shall be located on the southeast side of the trees along the boundary line.

3. Whether Plaintiff was prejudiced by the nine-month delay from the initial hearing and the final hearing.

## III. STANDARD OF REVIEW

This case was tried by the court without a jury. Therefore, our review of the trial court's decision is de novo with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2000). For evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001); *Walker v. Sidney Gilreath & Assoc.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). A trial court's conclusions of law are subject to de novo review with no presumption of correctness. *See Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

"In determining disputed boundaries, resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances." *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980) (citations omitted). The issue of where the boundary called for in the deeds is located on the surface of the earth is a question of fact. *See* 12 Am. Jur.2d *Boundaries* § 121 (1997).

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt*, 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). The trial court is in a better position than we are to observe the demeanor of the witnesses and evaluate their credibility. Thus, we will give great weight to a trial court's credibility determinations. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). This deference extends to a trial court's decision between competing surveys. *See Mix*, 27 S.W.3d at 514.

As noted in *Wood v. Starko*:

The governing rules are near universal . . . .

In 11 C.J.S. Boundaries [section] 3, p[age] 540, it is said:

> "It has been declared that all the rules of law adopted for guidance in locating boundary lines have been to the end that the steps of the surveyor who originally projected the lines on the ground may be retraced as nearly as possible; further, that ***in determining the location of a survey, the fundamental principle is that it is to be located where the surveyor ran it.***

*Any call*, it has been said, *may be disregarded, in order to ascertain the footsteps of the surveyor in establishing the boundary* of the tract attempted to be marked on the land; and the conditions and circumstances surrounding the location should be taken into consideration to determine the surveyor's intent."

(Emphasis added.). In Clark, Surveying and Boundaries (2d Ed. 1939), it is said at page 727, [s]ection 665:

"*The original survey must govern if it can be retraced. It must not be disregarded. So, too, the places where the corners were located, right or wrong, govern, if they can be found.* In that case a hedge planted on the line established by original survey stakes was better evidence of the true line than that shown by a recent survey. *In making a resurvey it is the surveyor's duty to relocate the original lines and corners at the places actually established and not to run independent new lines, even though the original lines were full of errors*."

(Emphasis added.). In 6 Thompson, Real Property, 594, Description and Boundaries, [s]ection 3047 (1962 replacement), the following is stated[:]

"The line actually run is the true boundary, provided the essential survey can be found and identified as the one called for, and prevails over maps, plats, and field notes. * * * The lines marked on the ground constitute the actual survey and where those lines are located is a matter to be determined . . . from all the evidence. If the stakes and monuments set at the corners of the parcel in making the survey have disappeared, it is competent to show their location by parol evidence."

At page 599, [s]ection 3049, it is further said that:

"Marked corners are conclusive and will control over courses and distances. *Although stakes are monuments liable to be displaced or removed, they control so long as it is certain that they mark the corners of the original survey*."

*Wood*, 197 S.W.3d at 259-60 (quoting *Sellman v. Schaff*, 269 N.E.2d 60, 66 (Ohio Ct. App.

1971)) (emphasis added). "Clearly encompassed in this rule is the fact that it is the monuments laid out by the original survey, if they can be located, which govern the boundaries, even if the actual survey used in the plat is in error." *Id.* at 260.

## IV. DISCUSSION

## A. BOUNDARY CORNER

Plaintiff asserts the evidence in this case preponderates against the trial court's finding of fact that the car axle established the southern corner of the boundary line. Rather, according to Plaintiff, the evidence revealed the car axle was located "near" the corner. Plaintiff argues that Mr. Sanders's drawing, which is unsigned, unstamped, and was created for purposes of other litigation, references the car axle while pointing toward a non-specific area in the disputed corner. Mr. Layne admitted during his testimony that he had no idea of what distance Mr. Sanders meant by "near" to the fence corner. Mr. Sanders's signed survey, on the other hand, shows the southern corner marked by a fence post. Plaintiff argues therefore that there is no evidence for the trial court to find the axle as being the actual southern corner. Plaintiff contends that while the trial court was correct to rely upon artificial objects or landmarks in establishing the boundary, the trial court simply relied on the wrong artificial object, i.e., the car axle, against the weight of the evidence when it should have relied on the location where remnants of fence were found in the hole at the location claimed by Plaintiff.

The facts and law support the trial court's opinion. Mr. Lawson initially did not rely on the survey of Mr. Sanders – he relied on the corner claimed by Plaintiff. He testified on cross-examination that he did not know if Plaintiff's claimed corner location was an old hole or a new hole:

Q Mr. Lawson, when you went to this property in October of 2007 Mr. Humberd pointed out where he said the corner was; is that correct?

A That's correct.

Q And you don't know if the hole that was there that you found with the rock and fence in it had been there for awhile or if it had been put there recently, do you, sir?

A No, sir.

Q And you're basing your survey and your opinions today on what Mr. Humberd told you was the corner; is that correct?

A Yes.

\* \* \*

Q . . . Now, in October of '07 you didn't have the benefit of the Neal Sanders' surveys, did you?

A No, I did not.

Mr. Lawson admitted that he had not looked at other surveys, adjoining property owners, or located other natural or artificial monuments from other properties to locate the southern corner. Mr. Layne testified that as he conducted his survey, he found old pins, the north corner, and the car axle as shown on Mr. Sanders's drawing. Mr. Layne related further that he examined the surrounding property deeds to locate the lines and relied on Mr. Sanders's survey and notes to determine the location of the line. He stated at trial that during his field work, "I'm walking the footsteps of Mr. Sanders – by turning his angles and bearings and distances . . . ." Mr. Layne told the court: "I never did find the posthole Mr. Lawson found. I looked. I never found that. . . . The only thing I found in that area, and I was there in 2005, was the car axle." Although Plaintiff criticized the fact that Mr. Layne was not licensed, he produced no evidence whatsoever at trial that Mr. Layne failed to follow industry standards or made gross errors. The evidence does not preponderate against the trial court's determination that the corner is located at the axle as the evidence does not "support another finding of fact with greater convincing effect." *Wood*, 197 S.W.3d at 257. Plaintiff failed to meet his burden of proof.

## B. FENCE

The trial court ruled the disputed boundary line should follow the line found by Mr. Lawson's survey. The order specifically states that the fence be restored to the former location with the trees. Plaintiff now argues the fence should be tacked to the southwest side of the trees and not the southeast side of the trees.

The trial court heard the testimony, examined the exhibits, and weighed the evidence using the correct framework when making its findings. We find that the evidence does not preponderate against the determination of the trial court as to the placement of the boundary between the parties. We find no discussion in the record before us regarding what side to

-12-

attach the fencing. Accordingly, we deem that argument waived. While admittedly outside our area of expertise, however, we offer a witness's observation from a prior opinion:

> I place [the wire for cattle fences] on my side for the main purpose that they are my cattle that I'm trying to keep in. And if you . . . put the fence on the other side, the cattle could push it down. And that's the reason you put the fence on the side that you are trying to retain the cattle in.

*Hollow v. Butler*, No. E2010-02150-COA-R3-CV, 2011 WL 3062021, at *2 (Tenn. Ct. App. July 26, 2011).

## C. DESCRIPTION OF THE BOUNDARY

The order entered by the court establishing the boundary included this language to establish the boundary:

> Beginning at an axle found in the Northern line of Fitzsimmons, and being the Northwest corner of the Humberd property (Deed Book 252, Page 392 in the Bradley County Register's office). Thence along the boundary line adjudicated by this Honorable Court the following calls and distances: North 28° 06 min. East 60.6 feet; North 31° 36 min. East 108.9 feet; North 31° 15 min. East 193.3 feet; North 31° 03 min. East 113.5 feet; North 30° 49 min. East 67.2 feet; North 31° 17 min. East 288.6 feet; North 32° 24 min. East 99. l feet; North 31° 05 min. East 89.2 feet; North 30° 08 minutes East 51.6 feet; North 31° 17 min. East 107.7 feet; North 31 feet 31° 25 min. East 138.3 feet to a wood fence post with a nail in the wood fencepost being the common corner between Fitzsimmons (Deed Book 3 8, Page 965 and Deed Book 1379, Page 310 in the Bradley County Register's office, Branham (Deed Book 1542, Page 54 in the Bradley County Register's Office and Humberd Deed Book 252, Page 392 in the Bradley County Register's Office). Being the same boundary line as set by the Bradley County Chancery Court in the case of <u>Humberd v. Fitzsimmons</u>, Docket #08-301 and as shown by a survey of Charles P. Lawson dated December 19, 2011, and revised August 9, 2012, a copy of which is attached.

The order at issue was prepared by the attorneys for the court. Although no ground for reversal, the court's order clearly contains errors. The beginning point at the axle is not the Northwest corner of Humberd property or in the Northern line of Fitzsimmons. Rather, it is the Southwest corner of Humberd property in the Southern line of Fitzsimmons. Upon

remand, the trial court is directed to enter an order with the correct description.

## D.  NINE MONTH DELAY

The trial began on April 8, 2010.  On the first day, the court heard testimony from all the witnesses appearing on behalf of Plaintiff, with the exception of Plaintiff.  The trial resumed on January 26, 2011.  Plaintiff therefore presented nearly all his proof over nine months earlier than Defendant.  Plaintiff observes that because so much time passed between the two trial dates, the court was forced to review the initial testimony by transcript.  According to Plaintiff, the presumption that the trial court is in a better position to evaluate witness credibility should dwindle with the passage of time.

There is no explanation in the record for the delay.  The trial judge acknowledged she reviewed her notes the night before the trial resumed.  Her comments throughout the proceeding on January 26, 2011, indicated she was familiar with the record.  Plaintiff has failed to provide any examples reflecting that the court was unable to remember the exhibits and testimony of the witnesses from the earlier date.  Further, Plaintiff has cited no cases or other authority to support his position.  Accordingly, we find this issue lacks merit.

## V.  CONCLUSION

The judgment of the trial court is hereby affirmed.  The costs on appeal are assessed against the appellant, Milton G. Humberd, Jr.  This case is remanded to the trial court for further proceedings consistent with this opinion.

_____
JOHN W. McCLARTY, JUDGE